**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DIVISION OF ARKANSAS**
**CENTRAL DIVISION**

**JASON MCGEHEE,** *et al*.                                                        **PLAINTIFFS**

**v.**                              **Case No. 4:17-cv-00179 KGB**

**ASA HUTCHINSON,** *et al*.                                                      **DEFENDANTS**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came before the Court for a bench trial (Dkt. Nos. 186-193).  Plaintiffs Stacey Johnson, Bruce Ward, Terrick Nooner, and Don Davis,[1] as well as intervenor-plaintiffs Justin Anderson, Ray Dansby, Gregory Decay, Kenneth Isom, Alvin Jackson, Latavious Johnson, Timothy Kemp, Brandon Lacy, Zachariah Marcyniuk, Roderick Rankin, Andrew Sasser, Thomas Springs, and Mickey Thomas (collectively, "plaintiffs") (Dkt. No. 111), were represented by counsel and presented proof (Dkt. No. 194).  Defendants Asa Hutchinson, who is sued in his official capacity as Governor of Arkansas, and Wendy Kelley, who is sued in her official capacity as Director of the Arkansas Department of Correction ("ADC") (collectively, "defendants"), were represented by counsel and presented proof (Dkt. No. 195).

Plaintiffs bring claims under 42 U.S.C. § 1983 challenging defendants' method of execution, performance of consciousness checks during executions, and viewing policy during executions (Dkt. No. 117).  Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following specific findings and conclusions.  The Court determines that defendants are entitled to judgment in their favor on plaintiffs' claim one under the Eighth Amendment and on plaintiffs' claim two under the Eighth Amendment and the Equal Protection Clause.  The Court further

---

[1] On November 14, 2017, the parties jointly filed a notice of commutation, confirming that the Governor commuted Jason McGehee's sentence from death to life without parole, thereby rendering the claims as to Mr. McGehee moot (Dkt. Nos. 100; 170, Stipulations, ¶ 3).

determines that plaintiffs are entitled to judgment in their favor, in part, and that defendants are entitled to judgment in their favor, in part, on plaintiffs' claims three and four under the First Amendment and the right to counsel under 18 U.S.C. § 3599.

## I.     Procedural History

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). On March 27, 2017, plaintiffs initiated this case by filing a complaint and motion for preliminary injunction (Dkt. Nos. 2, 3).[2]  In response to the complaint, defendants filed a motion to dismiss and responded in opposition to the motion for preliminary injunction (Dkt. Nos. 26, 28).  The Court conducted a hearing on the motion for preliminary injunction at which plaintiffs and defendants were represented by counsel and presented proof (Dkt. Nos. 34–36, 38–40, 46–52). This Court entered an order granting, in part, and denying, in part, defendants' motion to dismiss plaintiffs' initial complaint in this matter (Dkt. No. 53).  The Court also entered a Preliminary Injunction Order (Dkt. No. 54).  The Eighth Circuit Court of Appeals issued an order vacating this Court's preliminary injunction, *see McGehee v. Hutchinson*, 854 F.3d 488, 490 (8th Cir. 2017) (per curiam), from which a motion for stay of execution of sentence of death and petition for writ of *certorari* was taken.  The United States Supreme Court denied the stay of execution of sentences of death and denied the petition for writ of *certorari*.  *See McGehee v. Hutchinson*, 137 S. Ct. 1275 (2017).

While the appeal of the Preliminary Injunction Order to the Eighth Circuit was pending, the parties jointly proposed an execution viewing policy ("Joint Execution Viewing Policy") (Dkt.

---

[2]  Each of the named plaintiffs identified in the initial complaint filed a separate action in this Court.  On March 30, 2017, the Court entered an Order consolidating the pending cases into the *McGehee* case and directed that all filings be made in the *McGehee* case going forward (Dkt. No. 8).

Nos. 62, 63).  Plaintiffs moved later to clarify the policy, and defendants opposed the motion (Dkt. Nos. 73, 75).  The Court denied plaintiffs' motion to clarify the jointly agreed to viewing policy (Dkt. No. 76).

The Court was available by telephone to all counsel during each of the four April 2017 executions that proceeded.  For reasons not related to this litigation, the other executions set for April 2017 did not proceed.  On April 20, 2017, then-separate plaintiff Ledell Lee filed an emergency motion for injunction, which defendants opposed (Dkt. Nos. 70, 71).  The Court was prepared to rule orally on Mr. Lee's motion at 11:50 p.m., as his execution progressed.  Mr. Lee was pronounced dead at 11:56 p.m. on April 20, 2017.  By written order entered the next day, the Court denied Mr. Lee's motion for reasons set out in the Order (Dkt. No. 72).

On April 24, 2017, then-separate plaintiffs Jack Jones and Marcel Williams[3] were executed.  Mr. Jack Jones was executed first.  After Mr. Jack Jones' execution but prior to the commencement of Mr. Marcel Williams' execution, Mr. Marcel Williams filed an emergency motion to stay his execution based on allegations arising from events that occurred during Mr. Jack Jones' execution.  Plaintiff Marcel Williams' Emergency Motion to Stay Unconstitutional Execution, *Williams v. Kelley*, No. 5:17-CV-00103-KGB (E.D. Ark. Apr. 24, 2017), ECF No. 36. This Court temporarily stayed Mr. Marcel Williams' execution until defendants could respond in opposition to the motion.  Defendants opposed the motion.  Opposition to Plaintiff Marcell

---

[3] Mr. Marcel Williams filed in his own case an individual as-applied challenge under 42 U.S.C. § 1983 based on Eighth Amendment claims.  *See Williams v. Kelley*, No. 5:17-CV-00103-KGB (E.D. Ark. July 21, 2017).  On April 21, 2017, the Court conducted a preliminary injunction hearing with respect to these as-applied challenges and entered a written order denying the request for preliminary injunctive relief, which the Eighth Circuit affirmed on April 24, 2017.  *See Williams v. Kelley*, 854 F.3d 998 (8th Cir. 2017).  Mr. Marcel Williams filed a petition for writ of *certiorari* in the Supreme Court, which was denied.  *See Williams v. Kelley*, 137 S. Ct. 1284 (2017). Several docket entries relevant to matters addressed in this Order appear in Mr. Marcel Williams' individual case.

Williams' Emergency Motion to Stay Execution, *Williams*, No. 5:17-CV-00103-KGB, ECF No. 38. The Court conducted a hearing on the motion, denied the emergency motion, and lifted the temporary stay of execution. Mr. Marcel Williams was executed that night.

On April 27, 2017, then-separate plaintiff Kenneth Williams was executed. After Mr. Kenneth Williams' execution, plaintiffs filed an emergency motion for relief order to preserve evidence (Dkt. No. 78). Defendants opposed the motion (Dkt. No. 81). The Court conducted a hearing and then issued a written Order granting plaintiffs' motion (Dkt. Nos. 82, 83).

On June 21, 2018, plaintiffs filed an amended complaint that is the operative complaint in this matter (Dkt. No. 117). Defendants filed an answer (Dkt. No. 121). Defendants also filed a motion for summary judgment directed to certain counts in the amended complaint, which plaintiffs opposed (Dkt. Nos. 144, 150). The Court granted, in part, and denied, in part, defendants' motion for summary judgment with respect to certain claims prior to the bench trial (Dkt. No. 181).

Prior to trial, defendants filed a trial brief, to which plaintiffs responded (Dkt. Nos. 157, 166). Defendants submitted proposed findings of fact (Dkt. No. 169). The parties submitted jointly stipulated facts (Dkt. No. 170). The Court conducted an eight-day bench trial (Dkt. Nos. 186–93). After the bench trial concluded, the parties filed post-trial briefing for the Court's consideration (Dkt. Nos. 198–200, 203–205).

## II.    Findings Of Fact

1.    The Court considers the evidence that was received with regard to the motion for preliminary injunction and that would be admissible at the bench trial as a part of the trial record. *See* Fed. R. Civ. P. 65(a)(2). Pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure, this evidence was not required to be repeated at trial for the Court to consider it, even though the

Court did not advance the trial on the merits and consolidate it with the preliminary injunction hearing.

2. Except when pertinent for the analysis set forth in this Order, the Court does not repeat all of its findings of fact set forth in the Preliminary Injunction Order (Dkt. No. 54).

3. The Court adopts the parties' pre-trial stipulations (Dkt. No. 170).

### A. Parties

4. Plaintiffs, with the exception of Mr. McGehee, whose sentence was commuted from death to life imprisonment by Arkansas Governor Asa Hutchinson, are death-sentenced inmates currently incarcerated at the Varner/Varner Supermax Unit ("Varner Unit") of the ADC, in Lincoln County, Arkansas, which is in the Eastern District of Arkansas and under defendants' supervision and control.

5. Defendants Governor Hutchinson and Director Kelley, who are sued in their official capacity, are responsible for taking, and required by Arkansas law to take, certain actions specific to setting, setting the logistical procedures for, conducting, and, if necessary, suspending executions in Arkansas. *See* Ark. Const. art. 6, § 18; Ark. Code Ann. §§ 5-4-617, 16-90-502, 16-90-506, 16-90-507.

### B. Executions In Arkansas Generally

6. In 1983, the Arkansas General Assembly phased out electrocution as a means of executing inmates and adopted lethal injection as the primary method of execution through the Arkansas Method of Execution Act ("MEA"). *See* Ark. Code Ann. § 5-4-617. The current version of the Arkansas MEA provides two options for execution by lethal injection: "(1) [a] barbiturate; or (2) Midazolam, followed by vecuronium bromide, followed by potassium chloride." Ark. Code Ann. § 5-4-617(c).

7.     The State carried out four Midazolam executions in April 2017.  Ledell Lee was executed on April 20, 2017, Jack Jones and Marcel Williams were executed on April 24, 2017, and Kenneth Williams was executed on April 27, 2017 (Dkt. No. 170, Stipulations, ¶ 2).

8.     Prior to the 2017 Arkansas executions, the then-current version of the Arkansas MEA took effect on April 6, 2015.  The Court recited the history of legal challenges to the MEA in its Preliminary Injunction Order (Dkt. No. 54, at 3–7).

9.     Prior to the 2017 Arkansas executions, Director Kelley adopted and made public a written document regarding lethal-injection protocol for executions using Midazolam ("the Arkansas Midazolam Protocol") (Dkt. No. 2-2, Ex. 1).[4]

10.    The Arkansas Midazolam Protocol became final on August 6, 2015.  The protocol calls for executions to be performed as follows:  First, the prisoner will be injected with 500 milligrams ("mg") Midazolam.  At least five minutes after administration of the Midazolam has begun, the ADC Deputy Director or the ADC Deputy Director's Designee ("the Designee") will check the prisoner's consciousness using "all necessary and medically-appropriate methods."  If the Deputy Director or designee determines that the prisoner remains conscious, the prisoner will be injected with another 500 mg Midazolam.  Once the ADC Deputy Director or Designee determines that the prisoner is unconscious, the prisoner will be injected with 100 mg vecuronium bromide followed by 240 milliequivalents ("mEq") potassium chloride.  The parties stipulate to admit the Arkansas Midazolam Protocol as a trial exhibit (Dkt. No. 170, Stipulations, ¶ 1).

11.    The parties do not dispute that vecuronium bromide is a paralytic intended to paralyze the condemned individual and that potassium chloride is intended to stop the condemned

---

[4] In certain filings and during the proceedings in this case, counsel and the parties have referred to the Arkansas Midazolam Protocol as "Attachment C."

individual's heart and to cause death.  The parties in this litigation dispute the role that Midazolam plays in the Arkansas Midazolam Protocol.

### C.    General Scientific And Medical Evidence Relevant To Executions

12.    When discussing relevant medical concepts, the Court understands that there is a distinction between awareness, which is the ability to perceive an event, and amnesia, which is the inability to remember or recall later the event (Dr. Van Norman).[5]

13.    There is general medical consensus that Midazolam is effective in an overwhelming majority of individuals, but not all individuals, at rendering individuals unable to remember or recall later (Dr. Van Norman; Dr. Antognini; Dr. Buffington).

14.    Memory and pain are not the same thing; it is possible to experience pain but not to remember it (Dr. Antognini).

15.    Midazolam has an anxiolytic effect; in other words, it reduces or inhibits anxiety (Dr. Buffington).

16.    The science with respect to the study of Midazolam and its effects continues to evolve (Dr. Van Norman; Dr. Antognini).

17.    According to plaintiffs' expert Gail Van Norman, M.D., who is a professor of anesthesia and pain medicine at the University of Washington, there is general medical consensus that Midazolam has a "ceiling effect," which is the phenomenon in which a drug reaches a maximum effect, so that increasing the drug dosage does not increase its effectiveness (Dr. Van Norman).  At the preliminary injunction hearing, defendants' expert Joseph Antognini, M.D., admitted to testifying under oath previously that, at a clinical dose, he would expect to see what

---

[5]  The Court cites generally to the witness or witnesses upon whose testimony the Court relies in making certain factual findings; the final transcript of the bench trial is not yet available.

he termed, "the knee in the curve" (*i.e.*, the ceiling effect), and conceded that the academic literature supports a ceiling effect (Dkt. No. 54, at 62). However, at the bench trial, defendants' experts Daniel Buffington, Ph.D., who is a clinical pharmacologist and toxicologist and also a licensed pharmacist, and Charles Kokes, M.D., the Chief Medical Examiner of the Arkansas State Crime Laboratory, do not concede this (Dr. Buffington; Dr. Kokes).

18.     Even if Midazolam has a ceiling effect, there are no human studies of Midazolam that involve doses likely necessary to test a ceiling effect or that involve doses comparable to the dose required by the Arkansas Midazolam Protocol (Dr. Stevens; Dr. Buffington).

19.     It is unclear whether any ethics committee would approve studying in humans a dose of Midazolam large enough to examine a true ceiling effect (Dr. Antognini).

20.     There is no general medical consensus on the dose of Midazolam at which a ceiling effect is exhibited (Dr. Van Norman; Dr. Stevens).

21.     The Food and Drug Administration ("FDA")-approved dose of Midazolam is 0.6 mg per kilogram ("kg"), which equates to 60 mg per 220 pounds. The recommendations on the FDA-approved package insert for Midazolam vary, depending on factors such as whether the patient is premedicated and the age of the patient (Dr. Antognini).

22.     According to Dr. Antognini, a typical induction dose of Midazolam in a clinical setting is 0.2 to 0.3 mg per kg, which he anticipates would last 15 to 20 minutes and maybe more (Dr. Antognini).

23.     Scientific studies report the use of Midazolam alone prior to performing colonoscopies, tracheal intubation, bronchoscopy, urological procedures, and dental procedures (Dr. Antognini).

24.     The generally accepted use of Midazolam in a clinical setting has evolved over time (Dr. Van Norman; Dr. Antognini).  Currently, the generally accepted use of Midazolam is as a pre-operative sedative agent in the pre-operative holding area.  In the past, Dr. Van Norman trained in cardiac anesthesia beginning in the late 1980s and early 1990s by using a combination anesthetic that included a high-dose benzodiazepine in combination with a high-dose narcotic, plus a muscle paralytic agent.  At some point in her practice, Midazolam was the high-dose benzodiazepine used. At some point in her practice, the use of Midazolam in this manner was discontinued (Dr. Van Norman).

25.     In this protocol under which Dr. Van Norman trained, according to Dr. Van Norman, a high-dose narcotic was used because Midazolam has no clinically significant analgesic (*i.e.*, pain relief) properties, and the narcotic was administered for pain relief (Dr. Van Norman).

26.     Dr. Antognini agrees that Midazolam is not a potent analgesic (Dr. Antognini).

27.     According to Dr. Van Norman, she does not use Midazolam as the solo drug to produce general anesthesia for a surgical procedure and does not know of any reputable anesthesiologist who would do so today (Dr. Van Norman).

28.     Dr. Antognini maintains that Midazolam can be used to induce general anesthesia but that he would not want to use it for a prolonged procedure (Dr. Antognini).

29.     The American Society of Anesthesiologists makes a clinical recommendation that benzodiazepines, such as Midazolam and diazepam, not be used for general anesthesia (Dr. Antognini).

30.     Dr. Antognini agrees that there are currently available better drugs than benzodiazepines to induce general anesthesia, but he maintains that does not mean that benzodiazepines could not be used in that way (Dr. Antognini).

31.     Dr. Van Norman described studies that, by using the isolated forearm technique, have demonstrated that, even if individuals are prevented by benzodiazepines and Midazolam in general from remembering things, these types of drugs may not necessarily be good at preventing people from being aware of and experiencing them in the moment (Dr. Van Norman).

32.     According to Dr. Van Norman, a lack of movement by plaintiffs during the Arkansas Midazolam Protocol would not necessarily indicate a lack of awareness.  Midazolam has the potential to reduce responsiveness, and any movement may be masked by the introduction of the paralytic agent (Dr. Van Norman).

33.     There is general medical consensus that, in medical practice, healthcare providers titrate drugs like Midazolam based on the healthcare providers' evaluation of the level of consciousness in patients and that those consciousness checks rely on clinical observations of how patients are responding, not on any machines or monitors that can be applied to patients because no machines or monitors exist that reliably provide this information (Dr. Van Norman; Dr. Antognini).

34.     Researchers and clinicians developed a way to measure the depth of general anesthesia using the technique of electroencephalograms ("EEG").  The EEG recordings are processed on a computer with a method called bispectral analysis ("BIS").  BIS gives a single number on a scale from 100, which indicates completely awake and alert, to 0, which indicates coma and EEG burst suppression (Dkt. No. 2-2, Exhibit 16, at 32).

35.     The BIS, although helpful, is not a perfect monitor or 100% accurate in regard to determining consciousness or unconsciousness during surgery (Dr. Antognini).

36.     The EEG, although helpful, does not necessarily relay all of the information an anesthesiologist would need to know about how a patient is responding clinically to an anesthetic drug (Dr. Antognini).

37.     Dr. Van Norman described for the Court a scientific study involving halothane and Midazolam in which researchers examined "PRST response," which according to Dr. Van Norman looks at blood pressure, heart rate, and whether the person is sweating or tearing as examples of consciousness because the subjects of the study were paralyzed and unable to respond in other ways (Dr. Van Norman; Pls.'s Ex. 31).

38.     Typically, if an individual is awake and experiencing pain, it is expected that his heart rate and blood pressure will be higher (Dr. Antognini).

39.     Clinical techniques that are used in operating rooms across the nation to assess intraoperative consciousness include checking for purposeful movement, response to commands, open eyes, eyelash reflex, pupillary responses, perspiration, and tearing (Dr. Van Norman).

40.     Although Dr. Van Norman described the Isolated Forearm Technique as a reliable way to assess awareness under anesthesia, even she concedes that she has never used the technique in her practice and that it is not the standard of care in the United States for monitoring awareness during surgical procedures (Dr. Van Norman).

41.     In medical practice, patients are given a paralytic drug prior to some procedures to prevent the patient from moving and particularly when the surgeon needs deep muscle relaxation for the purpose of technically performing the surgery (Dr. Van Norman).

42.     In medical practice, patients are strapped down to the operating table so that the patient does not move or fall, especially when the operating table is tilted mechanically for the procedure (Dr. Van Norman).

43.     The American Society of Anesthesiologists, an educational, research, and scientific association of physicians organized to raise the standards of medical practice of anesthesiology as well as to improve patient care, produces a Continuum of Depth of Sedation Chart.  According to the Chart, to be in a state of deep sedation and analgesia, the individual must purposely respond following repeated or painful stimulation, with a notation that withdrawal from painful stimulation is not considered a purposeful response.  To be in a state of general anesthesia, according to the Chart, the individual is unarousable even with painful stimulus (Dr. Van Norman; Defs.' Ex. 82).

44.     According to the FDA-approved package insert, known side effects of Midazolam include involuntary movements and muscle tremors (Dr. Antognini; Dr. Buffington).

45.     Midazolam can in some cases, but not all, cause an individual to stop breathing from either the "central" mechanism, meaning the drive to breathe just stops, or it can cause airway obstruction, resulting from the tongue falling back, the airway muscles collapsing in a way, and the individual being unable to maintain his or her airway (Dr. Antognini; Dr. Buffington).

46.     It is not uncommon with benzodiazepines like Midazolam for individuals to experience partial airway obstruction, which can lead to feelings of air hunger and suffocation and can often arouse an individual out of sedation to breathe a little harder or to make harder respiratory efforts to get air in (Dr. Van Norman).

47.     It is generally understood that upper airway obstruction is not an indicator or denier of consciousness.  An individual can be obstructed and be fully awake or be obstructed and fully asleep (Dr. Van Norman).

48.     If an individual is aware of the airway obstruction, it is anticipated that the individual will be aroused and breathe on his or her own to maintain the airway but that does not occur when an individual has achieved a certain level of anesthesis or sedation (Dr. Antognini).

49.     Midazolam can cause cerebral hypoxia, which means an individual can get respiratory depression and then can stop breathing due to airway obstruction.  Cerebral hypoxia, which results from a lack of oxygen in the brain, can lead to unconsciousness (Dr. Antognini).

50.     An individual unconscious from hypoxia would not feel any type of stimulus or perceive the stimulus (Dr. Antognini).

51.     Coughing is a reflex response; it does not indicate consciousness or awareness (Dr. Antognini; Dr. Buffington).

52.     It is generally accepted that it would be very difficult to kill an otherwise healthy individual with a benzodiazepine like Midazolam alone (Dr. Van Norman; Dr. Stevens).

53.     Dr. Buffington, however, believes that this discussion about the potentially lethal effects of benzodiazepines alone is more complicated, given that Midazolam, according to the package insert from the FDA, indicates that airway obstruction, apnea, and cardiopulmonary arrest can occur and result in central nervous system depression (Dr. Buffington).

54.     By examining the Arkansas Midazolam Protocol, Dr. Van Norman is unable to say at what point any individual would experience extreme suffering and, instead, claims that that will vary from person to person (Dr. Van Norman).

55.     Dr. Van Norman conceded that she has no direct scientific data to support the proposition that any inmate experienced severe pain and suffering during an execution (Dr. Van Norman).

### D.     Pharmacology Of Midazolam

56.     Craig Stevens, Ph.D., has his doctorate in pharmacology, is a professor of pharmacology, and testified on behalf of plaintiffs (Dr. Stevens).

57.     Dr. Stevens testified as to how the drugs in the Arkansas Midazolam Protocol work mechanically (Dr. Stevens).

58.     Dr. Stevens does not believe that Midazolam produces general anesthesia, which he defines as unconscious, unaware, and, most importantly, insensate to pain ready for surgical cuts (Dr. Stevens).

59.     Dr. Buffington opines that a 500-mg dose of Midazolam, as outlined in the Arkansas Midazolam Protocol, is sufficient and appropriate based on its pharmacologic properties to render an inmate to a sufficient degree of sedation, consistent with industry standards to be insensate or unaware of pain (Dr. Buffington).

60.     Dr. Buffington has observed Midazolam used as the sole anesthetic agent for selective painful medical procedures that are short in duration, such as interventions or surgeries like colonoscopies, resetting bone, bone fractures, inner ear surgery, laser in-situ keratomileusis ("LASIK") eye surgery, Mohs surgery in dermatology, bone grafts, tonsillectomies, and vasectomies (Dr. Buffington).

61.     According to Dr. Buffington, when Midazolam has been given to an individual, due to the FDA reported side effects of Midazolam, reported physical movement or sound is not indicative of pain (Dr. Buffington).

62.     Dr. Stevens opined that Midazolam and benzodiazepines have a ceiling effect because the mechanism of action requires available *gamma*-Aminobutyric acid ("GABA") in the human body for the benzodiazepine to bind to and to produce the drug's intended effect.  Dr. Stevens maintains that it is generally accepted that there is a finite amount of GABA in the human body.  Thus, injecting more Midazolam, with no available GABA, will not have the intended effect, according to Dr. Stevens (Dr. Stevens).

63.     Dr. Buffington maintains that individuals do not run out of or deplete their supply of GABA; the body constantly reproduces it (Dr. Buffington).

64.     Dr. Buffington further maintains that, if the FDA dose and package insert recognize the ability of Midazolam to induce anesthesia, he does not find relevant any discussion of a ceiling dose or effect.  At the lower dose, the drug had its effect, according to Dr. Buffington (Dr. Buffington).

65.     Dr. Stevens also addressed the mechanisms of action for the other two drugs in the Arkansas Midazolam Protocol, vecuronium bromine and potassium chloride, as well as for barbiturates, pentobarbital, secobarbital, and the potent synthetic opioid fentanyl (Dr. Stevens).

**E.     Execution Eyewitnesses' Testimony**

66.     The Court heard testimony from numerous witnesses to the most recent Arkansas executions and to certain past executions in other states, describing their observations; this testimony was offered by both plaintiffs and defendants.

67.     With respect to executions outside of Arkansas, at the bench trial, the Court received testimony from Lisa Lagos, who works in the Federal Defender Capital Habeas Unit in the Southern District of Ohio and who witnessed Ronald Phillips' execution in Ohio in July 2017, under the then-current Ohio lethal-injection protocol; Santino Coleman, who, while working as a Federal Defender in the Middle District of Alabama, witnessed Torrey McNabb's execution in Alabama in October 2017, under the then-current Alabama lethal-injection protocol; and Steven Hale, who is a reporter in Tennessee and who witnessed Billy Ray Irick's execution in August 2018, under the then-current Tennessee lethal-injection protocol.

**1.     Witness Will Jones**

68.     Will Jones, who is a lawyer in the Special Investigation Division of the Arkansas Attorney General's Office, testified about what he witnessed during Mr. Lee, Mr. Jack Jones, and Mr. Marcel Williams' executions in April 2017 under the Arkansas Midazolam Protocol (Will Jones).

69.     He observed the Designee touch Mr. Lee's eyeball, as well as engage in other actions, such as squeezing Mr. Lee's hands, checking his sternum, and squeezing his trapezius, as part of the consciousness check, and Mr. Will Jones observed no reaction from Mr. Lee (Will Jones).

70.     Mr. Will Jones testified to the same observations during Mr. Jack Jones' execution, including the touching of his eyeball with no visible reaction from Mr. Jack Jones (Will Jones).

71.     Mr. Will Jones also testified to observing a consciousness check during Mr. Marcel Williams' execution with no movement by Mr. Marcel Williams following it (Will Jones).

72.     Mr. Will Jones admitted to having no formal training in what a consciousness check should look like and based his testimony on his own understanding and observations (Will Jones).

73.     Further, Mr. Will Jones explained that he was not sure if the sternum part of the check was to check consciousness near the start of the execution or to check breathing and for signs of life at the end of the execution (Will Jones).

### 2.     Witness Kim Hammer

74.     Kim Hammer is an Arkansas State Senator in the first year of his first term.  Prior to serving as an Arkansas State Senator, Senator Hammer served in the Arkansas House of Representatives for eight years (Hammer).

75.     Senator Hammer works as a church pastor and part-time chaplain for hospice.  In that capacity, for approximately 24 years, Senator Hammer has witnessed individuals at the end of life (Hammer).

76.     Senator Hammer witnessed the executions of Mr. Jack Jones and Mr. Marcel Williams in April 2017 under the Arkansas Midazolam Protocol.  He testified to observing similar consciousness checks during both executions and recalled seeing no movement from either Mr. Jack Jones or Mr. Marcel Williams after that time (Hammer).

77.     Senator Hammer was unaware that the second drug in the Arkansas Midazolam Protocol is a paralytic and that Mr. Jack Jones and Mr. Marcel Williams were administered a paralytic as a part of their executions (Hammer).

78.     Senator Hammer did not testify to sternum rubs or trapezius pinches being performed during either of the executions he witnessed because he did not recall whether they were performed or not; he recalled the palm check and eyelid check (Hammer).

### 3.     Witness Phyllis Hendrix

79.      Phyllis Hendrix, prior to her retirement, served as Chief Deputy of the White County, Arkansas, Prosecutor's Office (Hendrix).

80.     She witnessed Mr. Marcel Williams and Mr. Jack Jones' execution; she was not involved in investigating or prosecuting either individual at any time (Hendrix).

81.     She described a consciousness check that involved the Designee listening to Mr. Marcel Williams' breathing, touching his face, and checking his eyes by looking into them, although she does not recall the Designee physically touching Mr. Marcel Williams' eyes (Hendrix).

82.     She observed no response from Mr. Marcel Williams to these checks (Hendrix).

83.     She further observed that Mr. Marcel Williams was at peace and did not appear to suffer any pain throughout the entire process (Hendrix).

84.     She offered no direct testimony about consciousness checks during Mr. Jack Jones' execution and offered no testimony about sternum rubs or trapezius pinches during consciousness checks (Hendrix).

85.     Ms. Hendrix was unaware that the second drug in the Arkansas Midazolam Protocol is a paralytic and that Mr. Jack Jones and Mr. Marcel Williams were administered a paralytic as a part of their executions (Hendrix).

**4.     Witness Jacob Rosenberg**

86.     Jacob Rosenberg, who was a local reporter in April 2017, witnessed and described Mr. Marcel Williams' execution under the Arkansas Midazolam Protocol (Rosenberg).

87.     Based on his observations of Mr. Marcel Williams during the first few minutes of the execution and what he expected to occur during the execution, he believed that a second dose of Midazolam would have been administered to Mr. Marcel Williams, but Mr. Rosenberg admittedly has no personal knowledge of whether a second dose was given (Rosenberg).

**5.     Witness Jami Giani**

88.     Jami Giani, who was a lawyer with the Federal Defender Capital Habeas Unit in Little Rock, Arkansas, at the time, witnessed and described Mr. Marcel Williams' execution under the Arkansas Midazolam Protocol (Giani).

89.     According to Ms. Giani, Mr. Marcel Williams declined to make a final statement, and his execution commenced at 10:16 p.m. (Giani).

90.     Ms. Giani, who questioned Director Kelley and heard her prior testimony at the preliminary injunction hearing before this Court about what a consciousness check should involve,

questioned whether one was performed during Mr. Marcel Williams' execution, after having observed the execution (Giani).

91.     Ms. Giani saw the Designee touch Mr. Marcel Williams' neck, arms, and hands with what appeared to be light touches at approximately 10:19 and 10:20 p.m.; saw him lean down to Mr. Marcel Williams' ear and speak into it with what appeared to be soft tones; and saw him touch Mr. Marcel Williams' eyelashes.  She recalled the Designee on the right side of Mr. Marcel Williams, on the side with the intravenous ("IV") lines (Giani).

92.     She testified to observing slight head movements from Mr. Marcel Williams from time to time (Giani).

93.     Ms. Giani recalled the Designee placing a pulse oximeter on Mr. Marcel Williams' finger at 10:21 p.m. and removing it at 10:22 p.m. during the execution (Giani).

94.     Ms. Giani heard Mr. Marcel Williams cough at 10:25 p.m. and saw the Designee touch his eyelashes, hand, and arm again with what appeared to her to be soft touches (Giani).

95.     Then, at 10:28 p.m., Ms. Giani saw Mr. Marcel Williams' eye open and observed his iris and pupil actually moving (Giani).

96.     Ms. Giani still saw eye movement at 10:29 p.m.; saw what she believed to be the Designee touching Mr. Marcel Williams' eyelashes again at 10:31 p.m., with Mr. Marcel Williams' eye still open; and then saw the Designee pull out a stethoscope to check Mr. Marcel Williams and ask to call the coroner (Giani).

97.     Ms. Giani cannot testify if the cough, slight head movements, and eye movements she saw were voluntary or involuntary (Giani).

**6.      Witness Kelly Kissel**

98.    At the time of the April 2017 executions, Kelly Kissel was news editor and supervisory correspondent at the Associated Press in Little Rock, Arkansas (Kissel).

99.    From August 1994 to April 2017, Mr. Kissel witnessed 10 executions in Arkansas and Oklahoma, two of which were conducted under the Arkansas Midazolam Protocol:  (1) Mr. Marcel Williams and (2) Mr. Kenneth Williams (Kissel).

100.    During the April 2017 executions, Mr. Kissel did not see the medical technicians place the IV lines, and it was not announced when each of the execution drugs had been injected and were starting to flow (Kissel).

101.    In Arkansas, there is no audio from the execution chamber to the witness room after the execution commences (Kissel).

102.    These practices with respect to placement of IV lines, administration of execution drugs, and audio from the execution chamber were consistent with other Arkansas executions Mr. Kissel witnessed in the past (Kissel).

103.    Mr. Kissel, who has lost a portion of his hearing and consequently developed the ability to read lips, testified that, after a consciousness check, the individual who conducted the check mouthed, "I don't know."  Mr. Kissel is unaware to what the individual was referring or what question prompted this response (Kissel).

104.    During Mr. Marcel Williams' execution, Mr. Kissel observed that Mr. Marcel Williams appeared to have more labored breathing for a period of time as compared to what Mr. Kissel remembered from past executions that did not involve Midazolam (Kissel).

105.    During Mr. Kenneth Williams' execution, Mr. Kissel observed heavy breathing from Mr. Kenneth Williams; then, three to five minutes after the execution commenced, the upper portion of Mr. Kenneth Williams' body lurched forward approximately 15 times in quick

succession, hitting the gurney and the leather straps, banging very quickly; and then the upper

portion of his body lurched forward another five additional times in slower movements (Kissel).

106.     Although there was no audio from the execution chamber to the witness room after

the execution commenced, Mr. Kissel heard the thrashing noise of Mr. Kenneth Williams' upper

body and heard a groan or moan (Kissel).

107.     Mr. Kissel did not interpret the groan or moan as evincing pain; it did not sound

painful (Kissel).

108.     Mr. Kissel observed consciousness checks.  Based on his testimony, those did not

draw his particular notice, and he was not able to offer detailed testimony about the checks (Kissel).

### 7.     Witness Trent Garner

109.     Trent Garner, an Arkansas State Senator since 2016, testified as to what he

witnessed during Mr. Kenneth Williams' execution under the Arkansas Midazolam Protocol

(Garner).

110.     Senator Garner is a combat veteran, and he was a gunshot victim during a violent

crime (Garner).

111.     Senator Garner testified that, approximately two to three minutes after the curtain

to the execution chamber opened, Mr. Kenneth Williams lost consciousness in that his already

slurred speech stopped and there was no movement, no eye movement, no speech, and no action

(Garner).

112.     Senator Garner testified that, for approximately 10 to 15 seconds, Mr. Kenneth

Williams appeared to have involuntary muscle spasms during which his chest rose two to three

inches a few times, had more than a pronounced heavy breathing for approximately 10 to 15

seconds, but expressed no pain or grimacing on his face, made no noise to indicate pain, did not

reach his arms up to the restraints, and did not move his legs in a way to fight the restraints (Garner).

113.    After that, Senator Garner observed Mr. Kenneth Williams breathe heavily with almost a snore for approximately two to three minutes with no other kind of movement (Garner).

114.    Then, Senator Garner observed the consciousness checks but did not recall any of the precise movements made by the Designee.  He described the movements of the Designee as clinical and testified that he observed no response from Mr. Kenneth Williams (Garner).

### 8.    Witness Tammy Harrelson

115.    Tammy Harrelson, who worked as Chief Counsel for the Arkansas Office of Medicaid Inspector General at the time she testified, described what she observed as an execution witness during Mr. Kenneth Williams' execution under the Arkansas Midazolam Protocol (Harrelson).

116.    At the time of the April 2017 executions, Ms. Harrelson worked for the Arkansas Attorney General's Office in the Medicaid Fraud Control Unit (Harreslon).

117.    At some point earlier in her career, Ms. Harrelson worked as a prosecutor in Pulaski County, Arkansas (Harrelson).

118.    Ms. Harrelson had no investigatory or prosecutorial responsibility for any cases against Mr. Kenneth Williams (Harrelson).

119.    She did have prosecutorial responsibility for the capital conviction of Mr. Marcel Williams and testified against clemency at his clemency hearing (Harrelson).

120.    She also had prosecutorial responsibility for prior non-capital convictions of Mr. Lee (Harrelson).

121.   In addition, while she has no formal medical training, Ms. Harrelson worked previously as a plaintiffs' attorney, suing nursing homes, and, in that capacity, reviewed medical records and documents to assess the condition of her clients (Harrelson).

122.   Ms. Harrelson testified that, as a prosecutor, she was involved in putting someone on death row, so it was important to her that the punishment be done clinically, professionally, and with as little pain as possible (Harrelson).

123.   Further, given her prior experience as a plaintiffs' attorney, she believed that she knew what to look for during the execution to observe pain (Harrelson).

124.   As a result, she was really looking for signs and symptoms of pain during the April 2017 executions but saw none (Harrelson).

125.   During Mr. Kenneth Williams' execution, Ms. Harrelson observed him make his final statement, speak in religious tongues, and then go silent, just breathing and appearing unconscious (Harrelson).

126.   After approximately two or three minutes from the start of the execution, Ms. Harrelson saw Mr. Kenneth Williams' upper body begin to spasm.   This lasted between 10 and 15 seconds.   Then, Mr. Kenneth Williams continued to breathe heavily but did not spasm again (Harreslon).

127.   After that, she observed a consciousness check, specifically recalling someone sticking a finger into Mr. Kenneth Williams' eye but not recalling other steps taken.   Mr. Kenneth Williams did not respond to that (Harrelson).

128.   Then, she observed Mr. Kenneth Williams' breathing slow and then stop.   After that, he was pronounced dead (Harrelson).

129.    The movements Ms. Harrelson described as involuntary muscle spasms did not involve Mr. Kenneth Williams' whole body, so she did not believe them to be the result of a grand mal seizure.  The movements were rhythmic and did not appear voluntary or like Mr. Kenneth Williams was trying to move (Harrelson).

130.    During the time Mr. Kenneth Williams was spasming, Ms. Harrelson did not observe any facial grimacing, clenching of fists, or any signs or symptoms that she was taught to look for when someone is unconscious and you are looking for signs and symptoms of pain (Harrelson).

131.    According to Ms. Harrelson, Mr. Kenneth Williams did not respond to the consciousness checks (Harrelson).

### 9.    Witness Eric Motylinski

132.    Eric Motylinski, a lawyer with the Federal Defender Capital Habeas Unit in Philadelphia, Pennsylvania, was appointed 16 days prior to Mr. Kenneth Williams' scheduled execution to represent him.

133.    Mr. Motylinski testified that, a few days prior to his scheduled execution, Mr. Kenneth Williams agreed to the placement of stents due to a concern with finding a suitable vein for purposes of the execution and that the procedure to place the stents took almost an hour.  Mr. Kenneth Williams suffered from sickle cell anemia, which can sometimes make it difficult to find a vein (Motylinski).

134.    Mr. Motylinski was present during Mr. Kenneth Williams' execution and testified about the procedures of the Joint Execution Viewing Policy that were followed (Motylinski).

135.    Mr. Motylinski testified that, after it was announced that the execution would commence and audio to the execution chamber was turned off, he saw Mr. Kenneth Williams'

chest rise up and down, his head move back and forth, his jaw clench, and his cheek muscles move. He observed this for a minute or less (Motylinksi).

136.    Then, about a minute later, he described Mr. Kenneth Williams moving his head, heaving, choking, coughing, and moaning.  Mr. Motylinksi said it appeared that Mr. Kenneth Williams began to convulse up against the straps repeatedly and rhythmically, forcefully hitting the straps.  This occurred for approximately one minute (Motylinski).

137.    Mr. Motylinski then observed labored breathing from Mr. Kenneth Williams after these movements stopped (Motylinski).

138.    Mr. Motylinski grew concerned; conferred with the other lawyer-witness present, Cassandra Belter; and stepped outside of the witness room to make a phone call regarding these events.  He was out of the witness room from 10:57 until approximately 11:01 p.m. (Motylinski).

139.    He returned to the witness room after making the phone call, observed what he believed to be a consciousness check, and then witnessed Mr. Kenneth Williams be pronounced dead (Motylinski).

### 10.    Witness Cassandra Belter

140.    Ms. Belter, also a lawyer, works as an investigator with the Federal Defender Office in the Capital Habeas Unit in Philadelphia, Pennsylvania.  She, along with Mr. Motylinski, represented Mr. Kenneth Williams at the time of his execution (Belter).

141.    She witnessed Mr. Kenneth Williams' execution.  She heard his last statement at around 10:51 p.m. (Belter).

142.    The execution then commenced at 10:53 p.m. (Belter).

143.    At that time, Ms. Belter saw Mr. Kenneth Williams' eyes and mouth close and his raised thumb drop.  There was no movement (Belter).

144.     Then, later that same minute, Ms. Belter saw Mr. Kenneth Williams' head begin to bob or rock forward and backward, and then his chest began to rise basically at the same beat as his head.  These movements appeared to be syncopated and as fast as the beat of a heart (Belter).

145.     Through the next minute, Ms. Belter observed that the movements grew stronger and more violent, and Mr. Kenneth Williams appeared to be convulsing and hitting the restraints. Ms. Belter has observed convulsions before; she did not recall whether Mr. Kenneth Williams' head was restrained (Belter).

146.     At 10:55 p.m., according to Ms. Belter, Mr. Kenneth Williams groaned in pain.  His breathing was audible, and he gasped as it grew stronger.  Then, it sounded like he was choking (Belter).

147.     The noise was loud, unpleasant to hear, and in conjunction with his movements, which is why Ms. Belter used the term "pain" (Belter).

148.     At approximately 10:56 or 10:57 p.m., Mr. Motylinski left the witness room to make a call, and Ms. Belter stayed to witness the execution (Belter).

149.     She said that, when Mr. Motylinksi left the room, Mr. Kenneth Williams was still convulsing and gasping.  Then, Mr. Kenneth Williams' chest movements started to slow, but his head continued to bob (Belter).

150.     At approximately 10:58 p.m., it appeared to Ms. Belter that a consciousness check started, with men in the room interacting with Mr. Kenenth Williams by touching his eye (Belter).

151.     Mr. Kenneth Williams' head continued to move, and his mouth opened, according to Ms. Belter (Belter).

152.     The pace of these movements changed over time (Belter).

153.    Then, the same man who had been interacting with Mr. Kenneth Williams moved to the left of Mr. Kenneth Williams and began manipulating or pushing on his shoulder, at which point, apparently in response, Mr. Kenneth Williams groaned in pain, according to Ms. Belter (Belter).

154.    This was the second time that Mr. Kenneth Williams made a sound that indicated pain to Ms. Belter (Belter).

155.    Mr. Kenneth Williams' head and chest continued to move until approximately 10:59 p.m., when movement stopped, according to Ms. Belter (Belter).

156.    At around 11:01 p.m., Mr. Motylinski returned to the room.  It appeared to Ms. Belter that another consciousness check was performed, and Mr. Kenneth Williams was pronounced dead (Belter).

### F.    Cummins Unit Warden William Straughn

157.    William Straughn, Warden of the Cummins Unit of the ADC from 2015 through the date he testified in this matter, described his involvement in executions as an employee of the ADC since 1982 (Warden Straughn).

158.    The execution chamber is, and has always been during Warden Straughn's employment, at the Cummins Unit.  He has participated in various ways throughout his employment in preparation for and the carrying out of executions (Warden Straughn).

159.    Director Kelley conferred with Warden Straughn before the April 2017 executions were set.  Giving due consideration to the preparation time necessary and the stress and demands placed on ADC staff, Warden Straughn suggested that the executions be scheduled as they were, two executions per night with a few nights in between the scheduled executions (Warden Straughn).

160.     According to Warden Straughn, he proceeded as required by ADC policy in preparing ADC staff to carry out the executions in April 2017 (Warden Straughn).

161.     Warden Straughn assembled the necessary staff to carry out the duties and responsibilities for each execution.  Staff were not required to participate, but no staff member opted out of participation.  Warden Straughn met with every staff member to let them know what to expect (Warden Straughn).

162.     Staff practice for executions, going through the entire process to ensure staff are familiar with it and so that the process can go as smoothly as possible (Warden Straughn).

163.     Condemned inmates are not involved in these practices (Warden Straughn).

164.     Warden Straughn obtains information on the physical characteristics of each condemned inmate and, if necessary, plans and prepares staff to address those characteristics during the process.  For example, Mr. Marcel Williams was a very large man, while one of Mr. Jack Jones' legs had been amputated (Warden Straughn).

165.      Condemned inmates are not always housed in the Cummins Unit.  As a result, prior to the April 2017 executions, it was necessary to transfer the condemned inmates to the Cummins Unit (Warden Straughn).

166.     During and immediately after the transfer, Warden Straughn met with each condemned inmate and explained what would happen, who would be responsible for certain duties, and who to contact with questions.  Warden Straughn's goal was to make the process as peaceful as possible for the condemned inmate and staff; he believed that knowing what was going to happen in the days and hours leading up to the execution aided in that.  After the condemned inmate arrived at the Cummins Unit, each day before he left for the day, Warden Straughn met

with the condemned inmate to check on how the day went; sometimes he met with condemned inmates multiple times during the day (Warden Straughn).

167.     Warden Straughn also explained to the condemned inmate step-by-step what would happen when staff on the restraint team came to take him from his cell at the Cummins Unit to the execution room, and Warden Straughn was present during that entire process when it actually occurred (Warden Straughn).

168.     Warden Straughn was present when the IV team member installed the IVs for all but Mr. Marcel Williams, but he did not install the IVs himself (Warden Straughn).

169.     The IV team had difficulty installing the IVs for Mr. Marcel Williams and requested assistance.  During that time, Director Kelley excused everyone from the execution room while Mr. Marcel Williams' IVs were placed.  Warden Straughn returned to the execution room after Mr. Marcel Williams' IVs were placed (Warden Straughn).

170.     Warden Straughn was in the execution room during Mr. Lee, Mr. Jack Jones, Mr. Marcel Williams, and Mr. Kenneth Williams' executions.  Warden Straughn opened the curtain to the execution room at the start.  After each condemned inmate was afforded time to make a statement, Warden Straughn announced when each execution commenced, which was the signal to proceed with the chemicals (Warden Straughn).

171.     Warden Straughn testified that, for Mr. Lee, Mr. Jack Jones, and Mr. Marcel Williams, he observed a consciousness check that included a rubbing of the chest or sternal rub, someone speaking to the condemned inmate, and someone checking his eye area.  Warden Straughn saw no reaction from any of the condemned inmates (Warden Straughn).

172.     A tongue depressor also was used with Mr. Jack Jones to check him during the execution (Warden Straughn).

173.    For Mr. Marcel Williams, one of his hand restraints was left loose due to the fact that an IV was placed in his hand, according to Warden Straughn (Warden Straughn).

174.    For Mr. Kenneth Williams, Warden Straughn was present, Mr. Kenneth Williams made his statement, and the execution started while he was still talking.  He quit midsentence. Between the commencement of the execution and the consciousness check that Warden Straughn observed, he also observed Mr. Kenneth Williams' chest area, upper abdomen area, raising and lowering like someone was breathing very heavily.  He recalled hearing no sound during that time. He recalled no facial or expression changes on Mr. Kenneth Williams, and he observed no movements of Mr. Kenneth Williams' during that time (Warden Straughn).

175.    After the consciousness check of Mr. Kenneth Williams and until he was declared deceased, Warden Straughn observed no movement or reaction from him (Warden Straughn).

176.    Logs are kept for each execution; Warden Straughn does not take notes himself during the executions and has no reason to question the logs (Warden Straughn).

177.    Warden Straughn met with staff following Mr. Lee and Mr. Kenneth Williams' executions; no staff member asked to be, and no staff member was, removed from the execution team after Mr. Lee's execution (Warden Straughn).

178.    Warden Straughn reports to ADC Chief Deputy Director Dale Reed.  Director Kelley, Chief Deputy Director Reed, the Designee, and the Recorder also were in the execution room during the April 2017 executions (Warden Straughn).

179.    According to Warden Straughn, cell phones are not permitted in the visitation room because the ADC does not want anything to be recorded or videoed or to be disturbing to the victims or witnesses (Warden Straughn).

180.    According to Warden Straughn, the microphone to the viewing area has always been cut off at some point during executions and witnesses in the viewing room have never been allowed to observe placement of IVs into condemned inmates (Warden Straughn).

181.    Correctional officers have their own training and are required to be proficient to ADC standards on firing certain weapons, including a .22 caliber rifle and a 12-gauge shotgun (Warden Straughn).

182.    If the method of execution were firing squad, Warden Straughn has concerns about an appropriate space and having staff fire the weapons, witnesses view the execution, and someone designated to clean up and dispose of the remains (Warden Straughn).

### G.    ADC Deputy Director Dale Reed

183.    Dale Reed, who has worked for the ADC for 45 years and served as Chief Deputy Director of the ADC at the time of the April 2017 executions, explained the role that he played in the April 2017 executions (Reed).

184.    Deputy Director Reed attends meetings and practices and completes specific duties that he is called upon to perform prior to each execution.  He does not set the schedule for executions, meetings, or practices.  He was not involved in creating the execution protocol, obtaining execution drugs, or selecting the execution team (Reed).

185.    He was present for Mr. Lee, Mr. Jack Jones, Mr. Marcel Williams, and Mr. Kenneth Williams' executions in April 2017 under the Arkansas Midazolam Protocol (Reed).

186.    Deputy Director Reed observed consciousness checks with each condemned inmate and recalls those being the same steps for each check and each inmate (Reed).

187.    Deputy Director Reed testified inconsistently as to when he observed Mr. Kenneth Williams' movement where he appeared to breathe really hard and his chest came up like a

coughing movement but with no noise.  Deputy Director Reed initially testified that these movements occurred after the consciousness check, but then changed his testimony to be consistent with his prior sworn affidavit asserting that these movements occurred after the execution started but before the consciousness check (Reed).

188.    Deputy Director Reed admitted that he did not write his prior sworn affidavit but did read it and agree with its contents before he signed (Reed).

### H.    ADC Deputy Director Designee

189.    The Court received confidential, under seal testimony from a highly confidential witness who served as the Designee for the 2017 Arkansas executions under the Arkansas Midazolam Protocol.  The Designee described the consciousness checks called for by the Arkansas Midazolam Protocol and described how those checks were conducted in the most recent Arkansas executions (Highly Confidential Witness).

190.    The Court heard testimony from the Designee about each step of the consciousness checks as developed by the Designee, when the consciousness checks were conducted in relation to when the Midazolam injection was started and completed, and that the same consciousness checks were given to each individual during each of the four executions in Arkansas in 2017 (Highly Confidential Witness).

191.    At various points, the Designee was holding the hand of the condemned individual and watching the condemned individual intently from 18 to 24 inches away, at the most.  When it began, each consciousness check involved brushing the eyelashes, giving verbal commands at varying volumes from a whisper to a normal voice, listening to breathing sounds, checking for pulse by placing fingers on the carotid artery and checking a pulse oximeter, pinching the ear lobe,

pinching or squeezing the trapezius muscle, touching the eyeball, and then rubbing the sternum, in that order and for each individual (Highly Confidential Witness).

192.     The Designee testified that there was no change in the reading from the pulse oximeter during the administration of Midazolam, during the five-minute period after it, or during the consciousness checks.  Instead, for each individual, the changes in the pulse oximeter readings started sometime during the administration of the next two drugs in the Arkansas Midazolam Protocol (Highly Confidential Witness).

193.     After the conclusion of the Arkansas Midazolam Protocol, the Designee completed a second round of consciousness checks, used a stethoscope to check for heartbeat, and determined that the pulse oximeter reading was zero (Highly Confidential Witness).

## I.     ADC Director Kelley

194.     Director Kelley spoke with each condemned individual in the days leading up to the execution, asked if a member of the IV team could inspect his arms for IV placement in advance of the execution, and offered each condemned individual the option of having a central line placed prior to the execution, if the individual was concerned about IV placement, among other matters. Director Kelley testified about what she recalled from her discussions with each of the condemned individuals (Director Kelley).

195.     Director Kelley was in the execution room when each of the four condemned individual was escorted into the room in April 2017 and remained in the room for the duration of the executions (Director Kelley).

196.     Director Kelley testified that, prior to each execution in April 2017, each condemned individual was offered a sedative, that a prescription for a sedative was written for

each individual, and that she specifically knew that Mr. Jack Jones took the sedative (Director Kelley).

197.    Director Kelley conceded that she did not know whether the availability of a sedative for each condemned individual was called for or disclosed in the written Arkansas Midazolam Protocol, but she explained, "It's always been done."  (Director Kelley).

198.    Director Kelley explained that, during the execution, an individual serving as a recorder stands behind the podium ("the Recorder"), and Director Kelley stands next to that individual.  She and the Recorder both have pens and hand write to fill in blanks on a log, although some of the blanks on the log are filled in prior to events in the execution room because those blanks relate to a meal and shower (Director Kelley).

199.    After the execution is over, she returns to her office.  ADC Internal Affairs Administrator Raymond Naylor brings the handwritten version of the log to Director Kelley's office, and the handwritten notes are typed up in Director Kelley's assistant's office.  The log and the handwritten notes are reviewed to make certain they match; the log is given to the media (Director Kelley).

200.    Director Kelley testified that the times written on the logs were identical to the times handwritten on the notes.  Director Kelley further testified that, after each execution, she and the other responsible individuals did their best to make sure that everything was clear on the log and reflected accurately what happened (Director Kelley).

### 1.    Director Kelley's Description Of Leddel Lee's Execution

201.    Director Kelley was present for the placement of the IV lines into Mr. Lee and recalled no problem with placement of the lines (Director Kelley).

202.    Director Kelley asked Mr. Lee if he had any final words, and Mr. Lee did not audibly respond.  Director Kelley then approached Mr. Lee so that she was basically leaning over him face-to-face, asked a second time while making eye contact with Mr. Lee, and determined that Mr. Lee probably could not talk because he appeared to her to be so scared.  As a result, she stepped back, nodded to the Warden, and the Warden announced that the execution was ready to proceed (Director Kelley).

203.    At that point, Director Kelley understands the Midazolam was administered.  This is her understanding because they previously practiced this sequence of events; the executioner was told to administer the Midazolam; the Midazolam was already drawn into syringes; and the syringes were already connected to the IV lines.  The executioner only had to push the drug (Director Kelley).

204.    In addition, Director Kelley testified that the Designee had a habit of raising his hand to his microphone on the headset he wore when speaking to the executioner.  The Designee raised his hand to the microphone when Midazolam was started during each execution, according to Director Kelley (Director Kelley).

205.    From that time, Director Kelley watched the clock in the execution room to ensure that five minutes passed before the consciousness check happened (Director Kelley,).

206.    Director Kelley watched the Designee conduct the consciousness check.  She testified that she observed the Designee's hand go near Mr. Lee's ear and neck, the Designee touch one of Mr. Lee's eyeballs, and the Designee's hand go under the sheet to do a sternum rub (Director Kelley).

207.    Director Kelley observed no movement and heard no response or sounds from Mr. Lee, other than his breathing (Director Kelley).

208.    According to Director Kelley, Mr. Lee's execution went as it was supposed to go (Director Kelley).

## 2.    Director Kelley's Description Of Jack Jones' Execution

209.    Mr. Jack Jones opted to have a central line installed prior to the night of the execution (Director Kelley).  Mr. Jack Jones' attorney, Jeff Rosenzweig, offered testimony with respect to this decision and these events.  Transcript of Hearing on Emergency Motion to Stay Execution, *Williams*, No. 5:17-CV-00103-KGB (E.D. Ark. Apr. 24, 2017), ECF No. 40.

210.    Mr. Jack Jones took one prescribed dose of an unspecified sedative prior to his execution, and he asked Director Kelley for a second dose.  Director Kelley asked the medical provider if he would prescribe an extra dose, and the medical provider did that.  As a result, Mr. Jack Jones received a second dose of the sedative (Director Kelley).

211.    Mr. Jack Jones also had a prescription for methadone, and he received his evening dose of methadone prior to his scheduled execution (Director Kelley).

212.    Director Kelley was present when Mr. Jack Jones was escorted into the execution room (Director Kelley).

213.    Director Kelley afforded Mr. Jack Jones the opportunity to make a final statement, after which the Warden announced that the execution was ready to proceed and the microphone in the execution room was turned off (Director Kelley).

214.    Director Kelley described comments that Mr. Jack Jones made to her after the microphone was turned off, saying that she knew how he felt about her, and to the executioner, saying that he was sorry because no man should have to do this (Director Kelley).

215.    From the time the execution commenced until the consciousness check was performed, Director Kelley observed no movement from Mr. Jack Jones, although he went to sleep and started to snore (Director Kelley).

216.    Over certain concerns with Mr. Jack Jones, the Designee prior to performing the consciousness checks used a tongue depressor to make sure there were no problems with Mr. Jack Jones (Director Kelley).

217.    Director Kelley observed the consciousness check being performed on Mr. Jack Jones, the same way it had been performed on Mr. Lee (Director Kelley).

218.    Director Kelley saw no movement and heard no sounds, other than breathing that included snoring, between the consciousness checks and the time that Mr. Jack Jones was declared dead (Director Kelley).

### 3.    Director Kelley's Description Of Marcel Williams' Execution

219.    Plaintiffs' counsel filed an emergency motion to stay Mr. Marcel Williams' execution that night; the Court held a hearing and denied the motion.  Pl.'s Emergency Mot. Stay Unconstitutional Execution, *Williams*, No. 5:17-CV-00103-KGB (E.D. Ark. Apr. 24, 2017), ECF Nos. 36, 39.

220.    Prior to the execution, the IV team member could not place an IV in Mr. Marcel Williams' left arm.  Director Kelley cleared the execution room, had the executioner attempt to place the IV, and the executioner was able to place a second IV line into Mr. Marcel Williams' right arm.  Director Kelley testified that it took approximately 40 minutes to place an IV line for Mr. Marcel Williams prior to his execution and that his attorneys were not allowed to view that process (Director Kelley).

221.    Director Kelley secured the hand restraints after this second IV line was placed and intentionally left them loose so as not to cut off the IV line flow (Director Kelley).

222.    The log from Mr. Marcel Williams' execution reflects the time that events occurred after he was brought into the execution room for the second time that night, after the temporary stay of execution was lifted, according to Director Kelley (Director Kelley).

223.    Director Kelley contrasted her impression of Mr. Marcel Williams looking like he had made peace with what was about to occur when he was escorted into the execution room the first time and his looking fearful when escorted into the execution room the second time (Director Kelley).

224.    The Warden announced that the execution was ready to proceed (Director Kelley).

225.    According to Director Kelley, after the Midazolam was administered, Mr. Marcel Williams' breathing got heavy like he was asleep (Director Kelley).

226.    Director Kelley observed Mr. Marcel Williams' right hand relax, after the Midazolam was started but before the consciousness check.  According to Director Kelley, this made Mr. Marcel Williams' hand turn a fraction of an inch, maybe, but she was concerned about it because she had placed that restraint.  Other than this, Director Kelley observed no movement from the time the Midazolam was administered until the consciousness check was performed (Director Kelley).

227.    Director Kelley observed the consciousness check on Mr. Marcel Williams.  The checks were done on the right side of Mr. Marcel Williams, as opposed to the left side on which the checks were performed for each of the other condemned individuals.  This was the result of the IV placement for Mr. Marcel Williams (Director Kelley).

228.    Director Kelley observed no movement after the consciousness check was performed until Mr. Marcel Williams was pronounced deceased (Director Kelley).

229.    Director Kelley saw Mr. Marcel Williams' chest move from breathing but would not describe it in the way that Ms. Giani did.  Director Kelley saw no head movement from Mr. Marcel Williams, nor did she see Mr. Marcel Williams open his eyes.  She also testified that the Designee used a pulse oximeter during all four April 2017 executions, placed it on each condemned individual, and may have adjusted it slightly during the execution, but did not remove it until each execution was complete (Director Kelley).

### 4.    Director Kelley's Description Of Kenneth Williams' Execution

230.    Prior to the execution, Director Kelley spoke to Mr. Kenneth Williams about his last words and knew that she would hold a copy of a statement that Mr. Kenneth Williams would read and that then the microphone would be turned off as Mr. Kenneth Williams spoke to his God. Mr. Kenneth Williams said that he needed people to hear only his written statement (Director Kelley).

231.    Director Kelley held up the written statement, and Mr. Kenneth Williams read it. Then, the microphone was turned off, and he proceeded to appear to speak in tongues to his God (Director Kelley).

232.    After the Warden announced that the execution was ready to proceed and the Midazolam was administered, based upon Director Kelley's observation of the Designee raising his hand to the microphone, and the time the consciousness check was administered, Director Kelley saw movement from Mr. Kenneth Williams (Director Kelley).

233.    She explained that Mr. Kenneth Williams was quiet for approximately one minute after the execution started and then the trunk of his body or chest came up off the table and hit the

table like he was coughing, only there was no coughing sound.  Director Kelley described it as occurring during a span of approximately 10 seconds and happening approximately 15 to 20 times, with the first few times going faster and the last few times going slower (Director Kelley).

234.    She described these movements as rhythmic and did not believe that they could have been on purpose, based on what she observed (Director Kelley).

235.    Director Kelley saw no facial movements or facial reactions from Mr. Kenneth Williams during this time, and she was in a position to observe this (Director Kelley).

236.    She also did not see Mr. Kenneth Williams move his head, heave, choke, cough, or moan (Director Kelley).

237.    She did not hear any sounds from Mr. Kenneth Williams during this time, nor did she observe Mr. Kenneth Williams gasping for air (Director Kelley).

238.    Director Kelley saw no movement, clenching, or releasing of his fists or turning of his arms at this time (Director Kelley).

239.    She did not see any part of Mr. Kenneth Williams' lower body move at this time (Director Kelley).

240.    Director Kelley did not describe these actions as violent, but she did describe them as startling.

241.    Director Kelley testified that, had the events with Mr. Kenneth Williams gone on any longer, she would have thought that something needed to stop with the execution.  However, before that thought could formulate, the events with Mr. Kenneth Williams were over, according to Director Kelley (Director Kelley).

242. Director Kelley testified that, after the 10 seconds of rhythmic movements from Mr. Kenneth Williams stopped, at least 2 minutes passed before the consciousness check started (Director Kelley).

243. Director Kelley neither saw nor heard a response from Mr. Kenneth Williams to the consciousness checks, and she observed no movements and heard no sounds from him between the time the consciousness checks were performed and his death was announced (Director Kelley).

244. From the time that he was moved from death row, which is at the Varner Unit, to the holding cell at the Cummins Unit, Mr. Kenneth Williams was monitored constantly and observations were recorded by the ADC in a log. Further, because the holding cell is restricted housing, medical would make rounds every day to administer medication and check on the condemned individual, including recording or making a note of any medical injuries or issues even if the condemned individual did not report or complain to medical (Director Kelley).

245. Director Kelley has never seen any records to indicate that Mr. Kenneth Williams was knocked in his head while he was in the holding cell prior to his execution (Director Kelley).

### 5. Director Kelley's Handwritten Notes From The Executions

246. Director Kelley explained that, when she kept notes with the Recorder during the executions, there were some instances in which she jotted down the time that the second and third drugs in the Arkansas Midazolam Protocol were administered during an execution, but she did not do that for all executions (Director Kelley).

247. Director Kelley assumes that her handwritten notes are shredded after the log to be released to the media is typed from the handwritten notes taken by her and the Recorder and three individuals compare the information on the log to be released to the media and the handwritten notes to ensure accuracy. (Director Kelley).

248.     The times that the second and third drugs in the Arkansas Midazolam Protocol are administered are not reported on the log to be released to the media, and Director Kelley took no steps to ensure that her handwritten notes were kept after these executions (Director Kelley).

249.     When asked whether she had plans to change her policy with respect to disclosing or recording the time each drug in the Arkansas Midazolam Protocol is administered, Director Kelley said that she contemplated doing that, that it could easily be done, that it was not done, and that no one had asked that it be done (Director Kelley).

250.     Director Kelley testified that, leading up to the trial, no one had suggested to her that the policy needed to change to inform those observing as to when a particular drug was administered (Director Kelley).

251.     Director Kelley acknowledged that she knows when the drugs are administered and that, in the future, this is an aspect of the policy that she might change (Director Kelley).

**J.     The Autopsy Of Kenneth Williams**

252.     Mr. Kenneth Williams was executed on April 27, 2017 (Dr. Cohen).  Frank Peretti, M.D., performed an autopsy of Mr. Kenneth Williams on behalf of the State of Arkansas, but did not testify in this matter (Dr. Kokes).  Then, on April 30, 2017, Joseph I. Cohen, M.D., a forensic pathologist retained by plaintiffs, performed a second autopsy of Mr. Kenneth Williams (Dr. Cohen).

253.     As is standard for autopsies performed by the Arkansas State Crime Laboratory, two additional pathologists reviewed Dr. Peretti's report.  One conducted a technical review, and the other conducted an administrative review (Dr. Kokes).

254.     Charles Kokes, M.D., then then-Chief Medical Examiner of the Arkansas State Crime Laboratory, conducted the administrative review and testified on behalf of defendants (Dr. Kokes).

255.     Dr. Cohen, who testified on behalf of plaintiffs, is licensed to practice medicine in Arizona, California, and New York (Dr. Cohen).

256.     Dr. Cohen has worked as a forensic pathologist for 25 years, performing over 7,000 autopsies. A forensic pathologist is a medical doctor who generally performs autopsies for the purpose of determining the cause of death.  He has conducted autopsies on other individuals after execution by lethal injection, including Clayton Lockett and Joseph Wood (Dr. Cohen).

257.     The manner of death when an execution is conducted by the State of Arkansas is mandated by statute (Dr. Kokes).

258.     At the time of the autopsy, a high toxic level of Midazolam was in Mr. Kenneth Williams' system; the blood level was 1.8 micrograms per milliliter (Dr. Kokes).

259.     The State of Arkansas did not test for vecuronium or potassium chloride (Dr. Kokes).

260.     Dr. Cohen's opinion is that Mr. Kenneth Williams likely succumbed to the combined respiratory depressant effects of the Midazolam and vecuronium with probable contribution by the cardio toxic effect of potassium leading to cardiac arrest (Dr. Cohen).

261.     Dr. Cohen observed petechial hemorrhages at certain points on the underside of Mr. Kenneth Williams' eyelids; a contusion about two inches in greatest dimension on the right side of his occipital scalp behind the ear and a bit lower; and that his lungs were congested and edematous, which is heavy with water and blood (Dr. Cohen).

262.    Petechial hemorrhages are seen in deaths resulting from mechanical or positional asphyxia; they can result from seizure activity and hypoxia (Dr. Cohen; Dr. Kokes).

263.    Asphyxia is a complete lack or absence of air, and hypoxia is a shortage of air or an impediment of the passage of air from the environment into the lungs (Dr. Cohen).

264.    Dr. Cohen cannot testify at what point during the execution the petechial hemorrhages formed (Dr. Cohen).

265.    Dr. Cohen acknowledged that hypoxia can cause seizures and that seizures cause involuntary movements (Dr. Cohen).

266.    If a person is suffering from hypoxia or hypotension, the person is unconscious (Dr. Kokes).

267.    Dr. Kokes is unaware of any data that shows that, if a person is experiencing agonal breathing, he or she is feeling or experiencing pain (Dr. Kokes).

268.    Petechial hemorrhages were a non-specific finding by Dr. Cohen, meaning that the finding can be associated with a number of underlying conditions or problems and could have been formed in a number of different ways and for a number of different underlying reasons (Dr. Kokes).

269.    Dr. Kokes explained that formation of petechial hemorrhages requires a functioning cardiovascular system.  According to Dr. Kokes, Mr. Kenneth Williams' petechial hemorrhages likely formed sometime after the first dose of Midazolam was administered to him but before his death (Dr. Kokes).

270.    The petechial hemorrhages may also have resulted from agonal breathing, which is seen externally as irregular gasping, gurgling-type breathing (Dr. Kokes).

271.    Dr. Cohen concluded that the contusion likely occurred prior to Mr. Kenneth Williams' death (Dr. Cohen).

272.     Dr. Cohen saw no documentation that Mr. Kenneth Williams suffered an injury prior to the start of his execution.  Dr. Cohen is unable to explain with certainty how the contusion occurred (Dr. Cohen).

273.     Dr. Kokes testified that, because Dr. Cohen never examined the contusion under a microscope, Dr. Cohen is not able to say when Mr. Kenneth Williams suffered the contusion (Dr. Kokes).

274.     Dr. Cohen testified that the contusion resulted from force that would be painful and felt by a conscious or semi-conscious person (Dr. Cohen).  However, Dr. Cohen is unable to quantify any pain to Mr. Kenneth Williams, even if pain resulted from the contusion (Dr. Cohen).

275.     Further, Dr. Kokes does not agree that suffering the contusion means that Mr. Kenneth Williams experienced pain.  Dr. Kokes' opinion is that, if Mr. Kenneth Williams suffered the contusion at the time of the execution, it likely resulted from involuntary movement (Dr. Kokes).

276.     Lungs that are congested and edematous are consistent with respiratory failure. Fluid buildup in the lungs also could be caused from the dying process, terminal agonal breathing, and the effects of the paralytic (Dr. Cohen).

277.     Dr. Kokes testified that fluid in the lungs is a common result of death resulting from respiratory depression caused by multiple drug intoxication (Dr. Kokes).

278.     Dr. Cohen, having heard testimony of eyewitnesses to Mr. Kenneth Williams' execution and having conducted his autopsy, could not say if the movements of Mr. Kenneth Williams during the execution, as testified to by those witnesses, were voluntary or involuntary (Dr. Cohen).

279.    According to Dr. Kokes, the movements described by witnesses to Mr. Kenneth Williams' execution likely were involuntary and unconscious movements, as they appeared to be convulsions and were likely due to cerebral hypoxia resulting from several factors, including the respiratory depression and apnea caused by excessive amounts of Midazolam and hypotension, which is another known toxic effect of Midazolam.  According to Dr. Kokes, these conditions also can lead to involuntary sounds (Dr. Kokes).

### K.    Director Kelley's Viewing Policies

280.    On March 10, 2017, plaintiffs' counsel sent a letter to Director Kelley requesting disclosure of her viewing policies on the dates of the scheduled executions (Dkt. No. 2-2, Ex. 8).  Specifically, plaintiffs' counsel sought disclosure of Director Kelley's policies regarding permission for plaintiffs' counsel to witness the executions in the viewing area and the right of plaintiffs' counsel to bring telecommunications devices to the prison on the dates of the executions (*Id.*, at 1).

281.    By letter to plaintiffs' counsel dated March 16, 2017, counsel for Director Kelley responded to the inquiry regarding viewing policies during the executions (Dkt. No. 2-2, Ex. 9).  Counsel for Director Kelley asserted that only one attorney per inmate would be permitted in the viewing room during each execution (*Id.*, at 1).  Counsel for Director Kelley further asserted that plaintiffs' counsel would not be permitted to bring cell phones or tablets inside the prison facility, but Director Kelley would permit plaintiffs' counsel to "bring a lap top [sic] computer so long as the device is not equipped with photography, video, or audio recording capabilities."  (*Id.*).  The letter indicates that "[i]f counsel decides to return to the deputy warden's office rather than proceeding to the viewing area, there will be two phone lines . . . for inbound or outbound calls." (*Id.*, at 2).

282.     On March 20, 2017, counsel for Director Kelley sent an email to plaintiffs' counsel, clarifying the viewing policies with regard to telephone access (Dkt. No. 2-2, Ex. 10).  The email indicates that, "[i]f the attorney chooses to go to the viewing area, she will have no access to a phone during the execution" and that "[t]he attorney will not be allowed to leave and then return to the viewing area.  No phone access in the viewing area."  (*Id.*).

283.     On April 3, 2017, counsel for Director Kelley sent to plaintiffs' counsel a letter containing a document entitled "Execution Protocol – Legal Counsel for Inmates with Scheduled Executions" (Dkt. No. 28-16).  This letter indicated that changes had been made to the previous viewing policies including "provisions for the second legal counsel for the inmate." (*Id.*, at 1).  The attached execution protocol specified that, "[a]t the request of the inmate, one additional legal counsel will be allowed to enter the unit on the date of execution.  Such counsel shall be escorted directly to the Deputy Warden's office and shall remain there for the duration of his or her stay at the unit." (*Id.*, at 4).  The execution protocol further indicated that, "[o]n the date of execution[,] one legal counsel for the inmate shall be allowed to visit the inmate at the holding cell" and that, when the inmate is escorted to the execution chamber, "legal counsel may choose to be escorted to the witness room or . . . the Deputy Warden's Office or the visitation center."  (*Id.*, at 3).

284.     On April 6, 2017, Director Kelley signed an affidavit, a copy of which was attached to defendants' response to plaintiffs' motion for preliminary injunction, filed on April 7, 2017 (Dkt. No. 28-1).  In the affidavit, Director Kelley articulated different viewing policies than were represented in the letter dated March 20, 2017.  Specifically, Director Kelley provided that "legal counsel may choose to be escorted to the witness room, or, in the alternative, choose to be escorted to the Deputy Warden's office or the visitation center.  *Legal counsel must remain in that chosen location until the execution is complete*." (*Id.*, ¶ 46) (emphasis added).  Citing Arkansas Code

Annotated § 16-90-502(e)(1)(E), Director Kelley stated that, based on her investigation, "Arkansas law and ADC policy have always allowed only one attorney for the condemned inmate to witness an execution."  (*Id.*, ¶ 47).  Director Kelley then stated that, "at the request of the inmate, one additional legal counsel will be allowed to enter the unit," but that "[s]uch counsel shall be escorted directly to the Deputy Warden's office and shall remain there for the duration of his or her stay at the unit." (*Id.*, ¶ 48).  Director Kelley further stated that "[a]ll witnesses, including attorneys for the ADC, must surrender all cell phones, tablets, cameras, computers, and other recording devices at the ADC's Central Office in Pine Bluff before being transported to the Cummins Unit." (*Id.*, ¶ 50).  Director Kelley explained that "[t]wo outbound phone lines will be made available at the holding cells for the use of legal counsel.  Inbound and outbound phone lines and an inbound and outbound fax line will be made available in the Deputy Warden's office.  An outbound phone line will also be made available in the visitation center."  (*Id.*, ¶ 51).  Finally, Director Kelley stated that "upon request, legal counsel for the inmate will be permitted to bring a laptop computer into the unit and immediately to the Deputy Warden's office.  Any such laptop computer shall remain in the Deputy Warden's office for the duration of legal counsel's stay."  (*Id.*, ¶ 52).

285.    During the preliminary injunction evidentiary hearing in this case in 2017, Director Kelley testified about plaintiffs' counsel's access to the viewing room and outbound phone lines. Director Kelley testified that plaintiffs' lawyers "would have to choose between calling the Court and advising them of something happening with [their] client or actually witnessing the execution."  (Testimony of Hearing on Motion for Preliminary Injunction, Vol. 4, at 1218, Apr. 13, 2017).  When the Court questioned Director Kelley, she testified that the viewing room is a three-minute car ride from the Deputy Warden's office, where the telephone is that the attorneys can use to access the Court (*Id.*, at 1270–72).  Director Kelley also answered somewhat

ambiguously when asked whether the attorneys would be able to use a telephone in a "quiet cell," but she asserted that "[i]deally, they would go to the front where they have a phone and a fax and everything." (*Id.*, at 1271). By "front," the Court understands Director Kelley to be referencing the Deputy Warden's office.

286.    Also at the preliminary injunction evidentiary hearing, Director Kelley testified about the number of attorneys permitted to witness the executions.  At that time, Director Kelley suggested through her testimony that, because the witness room was very crowded, there was room for only one attorney to be present in the viewing room during the execution (*Id.* at 1135–37). However, Director Kelley acknowledged in her testimony that one of her predecessors permitted two attorneys to witness executions (*Id.* at 1137, 1279 ("I don't know about under Mr. [Art L.] Lockhart, but I know under Mr. [Larry] Norris, only one attorney was present, and even, to my knowledge, and we can ask Jeff [Rosenzweig], when Jeff was there under Mr. Lockhart and there were two attorneys, one didn't leave")).  Director Kelley testified that there would be 24 chairs in the viewing room, which she explained provided seats for up to 6 of the victim's family members, the inmate's attorney and spiritual advisor, and 12 citizen witnesses (*Id.*, at 1135).

287.    When the Court questioned Director Kelley about why 12 witnesses were necessary when the applicable statute provides for 6 to 12, Director Kelley stated that, "because I'm asking the witnesses to stay for two executions, I think that there's a chance that some of them won't, and I want to make sure I have at least six for the next one." (*Id.*, at 1273).  The Court then asked, "If you don't have more than six, if you have just the number you need, you have extra chairs in the witness room, would you entertain having lawyers come in if there's more than one lawyer for the inmate?" (*Id.*).  Director Kelley and her counsel answered ambiguously and stated that she would have to review the statute before answering that question (*Id.*, at 1273–74).  Finally, with respect

to the document entitled "Execution Protocol," which was attached to a letter dated April 3, 2017, Director Kelley testified that she had "the authority to make changes except for what the law tells me I can't change." (*Id.* at 1281; Defs.' Hr'g Ex. 16).

288.    After the Court entered its Preliminary Injunction Order in this case, the parties proposed a Joint Execution Viewing Policy (Dkt. No. 62).

289.    In a series of questions asked at the bench trial in this matter, Director Kelley was asked repeatedly about the ADC's past policy and practice during executions.  Director Kelley was specifically asked, "Has it ever been the policy of the Department of Correction to allow more than one attorney for the inmate inside the witness room?"  She testified, "That's never been the policy. We did allow it in 2017."  (Director Kelley).

290.    Director Kelley was never asked what the past practice, prior to 2017, had been regarding allowing more than one attorney for the condemned individual inside the witness room.

291.    At the bench trial in this matter, Director Kelley testified that, during the April 2017 executions, she allowed two attorney witnesses to be present for each execution, and the Deputy Director of the ADC held a cell phone that did not have a camera provided by the attorney witnesses and that was given to the attorney witnesses to use, if requested (Director Kelley).

292.    Director Kelley was not aware of any issues with that practice during the April 2017 executions (Director Kelley).

293.    While Director Kelley serves as Director of the ADC, if another execution is scheduled, she testified that she does not plan to go back on the agreement that was reached in this case (Director Kelley).

294.    Director Kelley is not opposed to the practice implemented by the parties' Joint Execution Viewing Policy being made a part of the ADC policy, but she would prefer that the

practice not be court-mandated due to concerns about a bill being considered by the Arkansas legislature that would jam cell phones in prison housing areas due to contraband and security issues. Director Kelley is concerned that, if the bill becomes law, then cell phones in the area where executions are conducted might also be jammed and unusable. Further, Director Kelley does not plan to make changes to the policy unless another execution is scheduled because she explained that she does not work on policy that is not being used (Director Kelley).

### L. Firing Squad As Potential Alternative Execution Method

295. The last execution by firing squad in the United States was carried out in 2010 by the State of Utah (Dkt. No. 170, Stipulations, ¶ 5).

296. James Williams, M.D., has a background in emergency medicine and as a SWAT medical director and officer. He offered testimony based on his experience personally in being shot in the chest by a friend with a .22 caliber rifle, which he described as initially not painful but instead as a severe numb sensation that persisted for several hours. He also offered testimony based upon his medical training, his treatment of numerous gunshot wound victims, his discussions with other medical providers, and anecdotal evidence regarding gunshot wounds (Dr. Williams).

297. He testified that, if a gunshot wound were delivered to the cardiovascular complex such that the bullet transected the individual's chest causing cessation of the circulation of blood to the brain, the individual would potentially experience pain for 7 to 10 seconds and then, after another 7 to 10 seconds, lose consciousness. However, Dr. Williams said the potential for pain during that period would likely mean feeling nothing more than the sensation of a powerful blow to the chest (Dr. Williams).

298. Dr. Antognini agrees that it would take 7 to 10 seconds for an individual to lose consciousness, but he believes that these individuals would experience pain between being shot

and losing consciousness, based on his experience treating gunshot victims in his career (Dr. Antognini).

299.    Dr. Antognini believes that the risk that a condemned individual would experience severe pain if Arkansas were to adopt for executions the firing squad certainly is not less, and is probably greater, than the risk of pain under the Arkansas Midazolam Protocol (Dr. Antognini).

300.    Dr. Williams conceded that he has never treated a gunshot victim within 60 seconds of receiving an injury to the chest, nor within 10 to 15 seconds of receiving an injury to the chest (Dr. Williams).

301.    Dr. Williams has also never treated a gunshot victim who has received five gunshot wounds to the chest with a .30 caliber rifle, which would be comparable to a firing squad, although he has treated a victim shot twice in the chest with a .30 caliber rifle (Dr. Williams).

302.    Dr. Williams acknowledged that there is nothing in the medical literature that addresses these issues (Dr. Williams).

303.    Dr. Williams could not testify that an execution by firing squad would be pain free. In fact, Dr. Williams testified that, if shot in a bone or joint causing a fracture, the gunshot wound would be painful, but he testified based on personal and medical experience that fractures in ribs are less painful than fractures in other bones or joints (Dr. Williams).

304.    Joseph Cummings, a senior investigator in the Federal Defender Capital Habeas Unit in the Eastern District of Arkansas, testified about touring the execution chamber of the Utah State Prison and photographing and taking measurements of the entire layout and the schematics of the layout where an execution by firing squad previously was carried out (Cummings).

305.     Gregory Peay, who is a Director of the Utah Department of Correction, offered testimony through deposition about prior executions in Utah, including an execution by firing squad (Peay)

306.     Steven Turley, who also is a Director of the Utah Department of Correction, offered testimony through deposition about prior executions in Utah, including an execution by firing squad (Turley).

**M.     Secobarbital As Potential Alternative Execution Method**

307.     The Court heard testimony from Charles Blanke, M.D., a physician licensed in Oregon.  Dr. Blanke described his academic, research, and clinical experience in the area of medical aid in dying, which refers to a physician helping a terminally ill patient obtain a prescription for lethal medication which if taken is intended to end the patient's life (Dr. Blanke).

308.     Secobarbital, a barbiturate, is the drug most commonly used for medical aid in dying.  Dr. Blanke has prescribed secobarbital for use in more than 90 medical-aid-in-dying procedures.  The dose of secobarbital depends on the body mass of the patient (Dr. Blanke).

309.     Secobarbital generally comes in a capsule form.  For medical-aid-in-dying procedures, the capsules are opened, emptied into four ounces of a liquid, and then consumed by drinking that liquid within two minutes (Dr. Williams).

310.     In certain cases the liquid can be administered through a nasogastric or feeding tube, inserted with the aid of the anesthetic lidocaine, which is readily available, through an individual's nose directly into their stomach.  Dr. Blanke testified that insertion of a feeding tube in this matter is not particularly painful (Dr. Blanke).

311.    Dr. Blanke has had 100 percent of his patients die from this procedure, typically by falling asleep after consuming the liquid, falling into a coma within about five minutes, and dying within typically 25 minutes later (Dr. Blanke).

312.    Death usually results from respiratory breathing or cardiovascular heart death (Dr. Blanke).

313.    Secobarbital is not a paralytic (Dr. Blanke).

314.    Dr. Blanke concedes that the literature does include cases in which patients have woken up after taking such doses, although he recited a low percentage of cases, and testified that he is not aware of any pain being experienced by patients who have woken up (Dr. Blanke).

315.    Dr. Blanke also concedes that half of the patients take longer than 25 minutes to die, with one reported case of a patient taking approximately four days to die (Dr. Blanke).

316.    Dr. Blanke acknowledges that determining the factors that might impact the time between ingestion and death is an evolving area of research.  There also is less data available starting in 2010 because Oregon changed its law then to no longer require a physician to be present for the procedure.  Secobarbital costs more today than in years past, so other, less expensive drugs are being considered and used more widely in this area (Dr. Blanke).

317.    Dr. Blanke is only aware of secobarbital coming in powder form (Dr. Blanke).

318.    Although Dr. Blanke was aware of a pharmacy that was willing to provide secobarbital for use in executions, that pharmacy is no longer willing to provide the drug for use in that way (Dr. Blanke).

319.    The Court heard testimony from John Kirtley, Ph.D., who serves as the Executive Director of the Arkansas State Board of Pharmacy.  He testified as to application and legal

requirements for pharmacies within and outside the state selling and supplying certain types of controlled substances, including certain types of compounded controlled substances (Dr. Kirtley).

320.    According to Dr. Kirtley, injectable secobarbital would have to be compounded (Dr. Kirtley).

### N.    Potential Alternative Execution Methods

321.    Dr. Blanke testified that pentobarbital, another drug used in the past for aid in dying purposes, is no longer readily available (Dr. Blanke).

322.    Sevoflurane gas has never been used to carry out an execution (Dkt. No. 170, Stipulations, ¶ 4).

### III.    Evidentiary Matters

There are two evidentiary matters that were raised at the bench trial and addressed by the parties' post-trial filings.  At the outset, the Court addresses and resolves these matters before turning to the merits of the parties' dispute.

### A.    Plaintiffs' Request For Adverse Inference

Plaintiffs argue in their post-trial brief:

Wendy Kelley testified that she took notes of when the drugs were administered. Astoundingly, she shredded them (or allowed them to be shredded) after the executions.  This litigation was ongoing and that information would have been highly probative to the questions before the Court.  Destruction of this record was prejudicial to Plaintiffs.  Because Kelley allowed the destructions, the Court should infer that the evidence would have been favorable to Plaintiffs' case.  *See Dillon v. Nissan Motor Co.*, 986 F.2d 263, 266–69 (8th Cir. 1993).

(Dkt. No. 198, at 36 n.3).

"A court's inherent power includes the discretionary 'ability to fashion an appropriate sanction for conduct which abuses the judicial process.'"  *Stevenson v. Union Pac. R.R. Co.,* 354 F.3d 739, 745 (8th Cir. 2004) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991)).

"In order for an adverse inference instruction for spoliation to be warranted, a district court is required to make two findings: '(1) there must be a finding of intentional destruction indicating a desire to suppress the truth, and (2) there must be a finding of prejudice to the opposing party.'" *Burris v. Gulf Underwriters Ins. Co.*, 787 F.3d 875, 879 (8th Cir. 2015) (quoting *Hallmark Cards, Inc. v. Murley*, 703 F.3d 456, 460 (8th Cir. 2013)).  This is a high bar because "[a]n adverse inference instruction is a powerful tool"; it "brands one party as a bad actor, guilty of destroying evidence that it should have retained for use by the jury," and "necessarily opens the door to a certain degree of speculation by the jury, which is admonished that it may infer the presence of damaging information." *Morris v. Union Pac. R.R.*, 373 F.3d 896, 900 (8th Cir. 2004).  "The district court 'has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors.'" *Davis v. White*, 858 F.3d 1155, 1160 (8th Cir. 2017) (quoting *Morris*, 373 F.3d at 901).

The Eighth Circuit appears to draw a distinction between the spoliation of evidence prior to litigation and during litigation.  When the destruction of evidence is alleged to have occurred pre-litigation, "a district court must issue explicit findings of bad faith and prejudice prior to delivering an adverse interference instruction." *Murley*, 703 F.3d at 461.  In contrast, when a party is found to have destroyed evidence during litigation, "a district court is entitled to fashion appropriate sanctions for such evasive litigation tactics—'even absent an explicit bad faith finding.'" *Id.* (quoting *Stevenson*, 354 F.3d at 750).

The Eighth Circuit's decision in *Stevenson* is instructive.  *Stevenson* arose out of a grade-crossing collision in which plaintiff-motorist's vehicle was hit by a train, and his wife was killed.  *See* 354 F.3d at 742.  The district court imposed the sanction of an adverse-inference jury instruction against defendant-railroad because, both prior to the filing of the lawsuit and during its

pendency, it destroyed two types of evidence:   (1) "the tape of any recorded voice radio communications between the train crew and dispatchers on the date of the accident," and (2) "all track maintenance records close in time to the accident."   *Id.* at 745.   The railroad appealed.   The Eighth Circuit found that the district court was within its discretion when it sanctioned the railroad for its pre-litigation destruction, pursuant to its routine document retention policy, of the tape-recorded voice radio communications, reasoning that it was unreasonable and amounted to bad-faith conduct for it to adhere to the policy in the circumstances of the case.   *See id.* at 747.   The Eighth Circuit explained that:

> The requisite element of prejudice is satisfied by the nature of the evidence destroyed in this case.  While there is no indication that the voice tape destroyed contained evidence that could be classified as a smoking-gun, the very fact that it is the only recording of conversations between the engineer and dispatch contemporaneous with the accident renders its loss prejudicial to the plaintiffs.  We find no abuse of discretion in the district court's decision to sanction the Railroad through an adverse inference instruction for its prelitigation destruction of the voice tape.

*Id.* at 748.

The Eighth Circuit also found that the district court was within its discretion when it sanctioned the railroad for its destruction, pursuant to its routine document destruction policy, of track maintenance inspection records after the commencement of litigation and the filing of plaintiffs' request for production of documents, reasoning that it amounted to bad faith for the railroad to make no effort to preserve these documents from its routine document destruction policy.   *See id.* at 748.   The Eighth Circuit elaborated:   "Sanctioning the ongoing destruction of records during litigation and discovery by imposing an adverse inference instruction is supported by either the court's inherent power or Rule 37 of the Federal Rules of Civil Procedure, even absent an explicit bad faith finding, and we conclude that the giving of an adverse inference instruction in these circumstances is not an abuse of discretion."   *Id.* at 750.

At the same time, the Eighth Circuit determined that the district court abused its discretion when it sanction the railroad for its pre-litigation destruction of track maintenance inspection records, reasoning that there was no showing that it "knew that litigation was imminent when, prior to any litigation, it destroyed track maintenance records from up to two years prior to the accident pursuant to its document retention policy," and that plaintiffs were not prejudiced by destruction of these records because they would not have shown the exact condition of the track at the time of the collision. *Id.* at 748–49.

Director Kelley testified that, during the April 2017 executions, an internal affairs representative was present.  Director Kelley was present, too, standing next to the internal affairs representative.  Both had pens in their hands during the executions and took notes regarding certain events; they did this to aid in completing the log required as a part of ADC policy, to be released after each execution.  In some instances, but not all, Director Kelley wrote down what time the second and third drugs of the Arkansas Midazolam Protocol were administered.  After each execution, the log is transported by the internal affairs representative back to Director Kelley's office, and she meets the representative there.  Three individuals are present; they check all of the times to make sure that everything is correct on the log.  Then, the log is publicly released.

Director Kelley assumes that, after that, her notes are shredded.  She testified that the internal affairs log includes only as much information as the ADC policy requires.  Director Kelley testified at trial that she now thinks that it might be a good idea to have information regarding when the second and third drugs of the Arkansas Midazolam Protocol are administered added to the internal affairs log.  She testified essentially that it could have been done if anybody had asked for it to be done ahead of time.

To be clear, plaintiffs challenge in their operative complaint Director Kelley's viewing policy, claiming that plaintiffs' counsel cannot tell when each drug is injected to ensure that the Arkansas Midazolam Protocol is followed and to ensure plaintiffs' right to counsel and right to access the courts (Dkt. No. 117, ¶ 51). Specifically, in their operative complaint, plaintiffs seek visual and audible signals of when each drug is being injected during the execution (*Id.*, ¶ 59). This claim and request for relief were first added to this action in June 2018, with the filing of plaintiffs' amended complaint (Dkt. No. 117).

However, when the April 2017 executions occurred and Director Kelley's notes were destroyed, the claim was still not in the case. On March 27, 2017, when plaintiffs filed their initial complaint in this case, they did not raise this specific claim (Dkt. No. 2). Although plaintiffs challenged Director Kelley's viewing policy in their initial complaint, they filed suit specifically over the number of lawyers for plaintiffs permitted to view each execution and those lawyers' access to a telephone during each execution (Dkt. No. 2, ¶¶ 166–73). The Court granted preliminary injunctive relief on this claim, finding plaintiffs likely to prevail on their claim that the viewing policy then in effect likely violated plaintiffs' right to counsel and right of access to the courts (Dkt. No. 54, at 101). As a result, the Court directed the parties to confer on the terms of a viewing policy to assure plaintiffs' right to counsel and right of access to the courts for the entire duration of all executions, stating that, if the parties failed to agree, each party could present its proposal in writing to the Court (*Id.*). The parties reached an agreement on the viewing policy that Director Kelley would follow during the April 2017 executions (Dkt. No. 62). That agreement included no mention of information about when the second and third drugs in the Arkansas Midazolam Protocol were administered.

After reaching that agreement but before the scheduled April 2017 executions, plaintiffs filed a motion with the Court to alter the agreed upon viewing policy, requesting that plaintiffs' counsel be permitted to view the entire execution, including the time period from when each plaintiff entered the execution chamber to be strapped to the gurney and to have intravenous lines affixed and not just from the time right before the execution drugs were about to flow (Dkt. No. 73).  Defendants responded in opposition to the motion, and the Court denied the motion prior to the executions (Dkt. Nos. 75, 76).  Prior to the April 2017 executions, plaintiffs made no request to modify the agreed upon viewing policy to address when the second and third drugs in the Arkansas Midazolam Protocol were administered.  Additionally, in their original complaint, plaintiffs allege that their "right to counsel requires that their attorneys have a complete visual and audio access to the execution from the time plaintiffs enter the chamber to the time they are pronounced dead." (Dkt. No. 2-2, ¶ 180).  This allegation was related to Director Kelley's alleged shutting off of the execution chamber's audio, which would prevent plaintiffs' attorneys from hearing any audible reaction plaintiffs might have to the drugs (*Id.*).

Further, there is no evidence in the record before the Court that, at the time of the April 2017 executions, there was a pending discovery request to defendants specifically seeking this information or documents including this information.

On this record, considering the controlling legal authorities, the Court declines to impose an inference that the evidence in Director Kelley's notes of when, in some instances but not all, the second and third drugs of the Arkansas Midazolam Protocol were administered would have been favorable to plaintiffs' case.

### B.      Defendants' Request To Admit Numerous Documents

At the preliminary injunction hearing, defendants introduced numerous exhibits through the testimony of Dr. Buffington and Dr. Antognini by merely asking the expert witness on the stand if he relied on the study (Transcript of Hearing on Motion for Preliminary Injunction, Vol. 3, at 624–25, Apr. 12, 2017; Vol. 4, at 979–988).  Aside from citing studies as reliance materials, the experts offered little, if any, explanation for many of these studies at that time.  Many of these exhibits were admitted at the hearing on the motion for preliminary injunction without objection from plaintiffs' counsel (Dkt. No. 48).  Many of these studies were not listed on defendants' exhibit list for the bench trial (Dkt. No. 195), nor were these studies reviewed with defendants' expert witnesses during their testimony at the bench trial.

Beginning during Dr Stevens' direct testimony at the bench trial, defendants objected under Federal Rule of Evidence 803(18) to plaintiffs' introduction into evidence of numerous treatises and studies.  Defendants asserted that the documents are hearsay and may be read into evidence, but the documents themselves should not to be received as evidence by the Court.  In response to the objection, plaintiffs asserted that they intended to ask to admit each exhibit after the exhibit was discussed with the witness on the stand pursuant to Federal Rule of Evidence 703.  Plaintiffs explained that their experts had based their opinions in part in reliance upon the treatises and studies marked as exhibits, used that data in considering their opinions and informing their opinions, and that the probative value of admitting the treatises and studies as evidence would be greater than the prejudicial effect.

The Court clarified that defendants' position was that an expert could read word for word the treatise or study into evidence but that the document could not be admitted under Rule 803(18), a proposition with which defendants agreed.  Further, the Court clarified that defendants had no

objection to the testimony being offered by the expert witness, only to the request by plaintiffs for the Court to admit the document (Dr. Stevens).

The Court determined that, even if objectionable under Rule 803(18), Rule 703 trumped Rule 803(18).  Pursuant to Rule 703, even if inadmissible, the proponent of the opinion may disclose the otherwise inadmissible facts or data to the jury if probative in helping the jury evaluate the opinion and if the probative value substantially outweighs the prejudicial effect.  *See* Fed. R. Evid. 703.  As a result, the Court received the exhibit at issue during Dr. Stevens' testimony and other similar exhibits as evidence offered by plaintiffs during this bench trial.  The Court recognized a continuing objection from defendants and ruled consistently on the objections.

Later during the bench trial, defense counsel represented that all counsel agreed, based upon Federal Rule of Civil Procedure 65(a)(2), that evidence received on the motion for preliminary injunction that would be admissible at trial becomes part of the trial record and need not be repeated.  As a result, defense counsel claimed that, for purposes of trial, all treatises and studies referred to by defendants' witnesses at the preliminary injunction hearing were admitted for purposes of the bench trial (Dr. Stevens; Dr. Buffington).  Defense counsel requested to incorporate the prior testimony of Dr. Antognini and Dr. Buffington offered at the preliminary injunction hearing and to move into evidence for purposes of the bench trial the following treatises, studies, and articles:  Defense Exhibits 5, 6, 12, 16, 25, 26, 35–42, 44–73 (argument post-bench trial).

Plaintiffs' counsel disagreed with the general representation regarding the parties' purported agreement, asserting that the parties agreed prior to the bench trial to abide by Federal Rule of Civil Procedure 65(a)(2) and preserved all objections, meaning only if an item is admissible at trial should it become part of the trial record (Dr. Stevens).  Further, plaintiffs'

counsel raised a number of objections to the specific defense exhibits referenced (argument post-bench trial).  Specifically, plaintiffs' counsel recounted that, at the preliminary injunction hearing, defense counsel gave the title of a treatise, study, or article; asked Dr. Antognini or Dr. Buffington if he relied on it; and then admitted it at the hearing in many instances with no further discussion or reference to the exhibit.  Plaintiffs' counsel observed that the treatise, article, or study cited is hearsay under Rule 803(18), as defense counsel previously claimed, but there was no discussion with the witness at the preliminary injunction hearing or bench trial regarding the treatise, article, or study, nor was there a showing under Rule 703 that admission would be more probative than prejudicial (argument post-bench trial).

Defense counsel admitted that, as a result of the Court's ruling with respect to Rule 703 and the admission of each treatise, article, or study discussed by plaintiffs' experts at the bench trial, defendants were belatedly seeking to meet proof with proof (argument post-bench trial).

As an initial matter, the Court observes that the evidentiary ruling was made by the Court during the bench trial in plaintiffs' case-in-chief, specifically with Dr. Stevens' testimony, before defendants' experts ever took the stand to testify during the bench trial, including Dr. Antognini and Dr. Buffington.  Defendants did not address this matter during their presentation of proof with defense witnesses but certainly could have done so.

In their post-trial submission, plaintiffs withdraw their objections to the following exhibits, having reviewed the preliminary injunction record:  Defendants' Exhibits 12, 26, 36, 40, 43, 49, 50, 51, 62, 68, 70, 73 (Dkt. No. 198, at 24–25 n.2).  Plaintiffs maintain their objection to the remaining exhibits, arguing that defendants "have made no showing that their probative value outweighs their prejudicial effect under Rule 703."  (*Id.* at 25 n.2).

The Court has examined the preliminary injunction record in this matter, as well as the trial record.  This dispute goes to whether to admit the purportedly scientific source material on which the experts claim to rely.  Many of these studies involve BIS data.  As plaintiffs acknowledge:

> the experts have been using the BIS studies for two distinct purposes.  The first purpose is to show changes in brain activity relative to either the passage of time or the injection of more [M]idazolam.  This is a valid exercise and provides useful evidence for the ceiling effect of [M]idazolam or for the duration of the drug's effect.  The second purpose is to show that [M]idazolam itself renders a person unaware to painful stimulus.  This use is more questionable.  As both Drs. Antognini and Van Norman explained, the BIS monitor can't reliably gauge whether someone is unaware and ready for surgery.  Moreover, Dr. Buffington was forced to admit on cross-examination at trial that the studies he relies on don't exhibit general anesthesia even by the manufacturer's stated criterion (a score below 60 on a 100-point scale).  Faced with this data, Dr. Buffington contended that the drug generates "deep sedation" and that there's no requirement to achieve general anesthesia in the first place.  That point undermines his earlier testimony that midazolam will achieve a state of general anesthesia necessary to prevent the inmates from feeling pain from the second and third drugs.

(Dkt. No. 198, at 24).

The Court is the factfinder in this bench trial.  When examining all admissible record evidence in this case, the Court is mindful of the parties' arguments regarding the studies, the weight to be afforded the studies, and the weight to be afforded to the expert testimony, if any, offered in claimed reliance on the studies.  Having considered the parties' arguments and legal authority, the Court rules on each exhibit defendants moved to admit consistent with Court's Exhibit A attached hereto.

## IV.     Conclusions Of Law

The Court now turns to the merits of the parties' claims.

### A.     Claim 1:  The Eighth Amendment Prohibition On Cruel And Unusual Punishment And The Arkansas Midazolam Protocol

"[C]apital punishment is constitutional.  It necessarily follows that there must be a means of carrying it out."  *Baze v. Rees*, 553 U.S. 35, 47 (2008) (plurality opinion)[6] (citation omitted). The Eighth Amendment, made applicable to the states through the Due Process Clause of the Fourteenth Amendment, proscribes "cruel and unusual punishment."  U.S. Const. amend. VIII; *see also Hall v. Florida*, 572 U.S. 701, 707–08 (2014) (recognizing that the Fourteenth Amendment applies the Eighth Amendment's restrictions on "cruel and unusual punishments" to the states).  The Eighth Amendment's protections do not evaporate because a person commits "heinous crimes."  *Roper v. Simmons*, 543 U.S. 551, 560 (2005).  However, those protections derived from the Eighth Amendment do not guarantee a pain-free execution.  *See Bucklew v. Precythe*, 139 S. Ct. 1112, 1124 (2019).

In the execution context, "[t]he Eighth Amendment does not come into play unless the risk of pain associated with the State's method [of execution] is 'substantial when compared to a known and available alternative.'"  *Id.* at 1125 (quoting *Glossip v.  Gross*, 135 S. Ct. 2726, 2738 (2015). Thus, courts analyze Eighth Amendment challenges to a state's method of execution under the two-prong *Baze/Glossip* test.  *See id.* at 1129 (stating that "anyone bringing a method of execution claim alleging the infliction of unconstitutionally cruel pain must meet the *Baze-Glossip* test"). Under the first prong, a method-of-execution challenger must establish that a state's chosen method "presents a risk that is '*sure or very likely* to cause serious illness and needless suffering,' and give rise to 'sufficiently *imminent* dangers.'"  *Glossip*, 135 S. Ct. at 2737 (quoting *Baze*, 553 U.S. at 50).  Stated differently, to prevail on a method-of-execution claim, "there must be a 'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison

---

[6]  In *Bucklew v. Precythe*, the Supreme Court noted that *Glossip v. Gross*, 135 S. Ct. 2726 (2015), clarified that Chief Justice John Roberts's plurality opinion in *Baze* was controlling under *Marks v. United States*, 430 U.S. 188 (1977).  *See* 139 S. Ct. 1112, 1121 (2019).

officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" *Id.* (quoting *Baze*, 553 U.S. at 50). The *Baze/Glossip* test's second prong requires a method-of-execution challenger to demonstrate "a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason." *Bucklew*, 139 S. Ct. at 1125 (citing *Glossip*, 135 S. Ct. at 2732–38, and *Baze*, 553 U.S. at 52).

Plaintiffs claim in count one of their amended complaint that the use of Midazolam in the Arkansas Midazolam Protocol poses an objectively intolerable risk of substantial harm that is sure or very likely to occur and that alternative execution methods that would avoid the risk are feasible and readily available to the ADC (Dkt. No. 117, ¶ 26). The Court examines each prong of the *Baze/Glossip* test in the light of the proof presented by the parties.

### 1.    *Baze/Glossip* First Prong

To prevail on their Eighth Amendment challenge, plaintiffs must first prove that Arkansas's current method of execution "entails a substantial risk of severe pain." *Glossip*, 135 S. Ct. at 2731. Neither the Supreme Court nor the Eighth Circuit has provided a bright line delimiting when a risk is substantial or what threshold of pain is sufficiently severe so as to give rise to an "objectively intolerable risk of harm." *Id.* at 2737 (quoting *Baze*, 553 U.S. at 50). The Court looks to the case law for guidance.

In *Baze,* the Supreme Court stated that "a condemned prisoner cannot successfully challenge a State's method of execution merely by showing a slightly or marginally safer alternative." 553 U.S. at 51. The *Baze* Court warned that hinging an Eighth Amendment violation on such a showing threatened "to transform courts into boards of inquiry charged with determining 'best practices' for executions." *Id.* Under *Baze*, the mere fact that "an execution method may

result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual."  553 U.S. at 50.

To illustrate this idea, the Supreme Court compared two circumstances to explain what constitutes an objectively intolerable risk.  The Court referred to its plurality decision in *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459 (1947), which "upheld a second attempt at executing a prisoner by electrocution" after a mechanical issue thwarted the first attempt.  *Id.*  The *Baze* Court noted that the second attempt did not violate the Eighth Amendment because the first attempt was "'an accident, with no suggestion of malevolence[.]'"  *Id.* (quoting *Resweber*, 329 U.S. at 463). The *Baze* Court remarked that "an isolated mishap alone does not give rise to an Eighth Amendment violation, precisely because such an event, while regrettable, does not suggest cruelty, or that the procedure at issue gives rise to a 'substantial risk of serious harm.'"  *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)).  In comparison, the *Baze* Court explained that, if the state's subsequent attempt to execute the prisoner had followed "a series of abortive attempts at electrocution," the subsequent execution "would demonstrate an 'objectively intolerable risk of harm' that officials may not ignore."  *Id.* (first quoting *Resweber*, 329 U.S. at 471 (Frankfurter, J., concurring); then citing *Brennan*, 511 U.S. at 846 n.9).  Stated differently, if the state attempted to execute a prisoner using a method that had repeatedly failed, that would suggest that the state was acting wantonly or that the procedure at issue presented a "substantial risk of serious harm."  *Id.* (quoting *Brennan*, 511 U.S. at 842).

In *Bucklew*, the Supreme Court confronted an as-applied[7] challenge to Missouri's lethal injection method of execution, a single-drug protocol using the sedative pentobarbital.  *See* 139 S.

---

[7]  *Bucklew* settled the question of whether "as-applied" challenges are subject to the same analysis as facial challenges.  Mr. Bucklew conceded that Missouri's "lethal injection protocol [was] constitutional in most applications," but he argued that, because of his unique medical

Ct. at 1120–22.  There, the Supreme Court emphasized that it "has yet to hold that a State's method of execution qualifies as cruel and unusual," but it accepted the possibility that a state may cross the line and credited *Baze* with providing "critical guidance" in drawing this line of demarcation. *Id.* at 1124, 1125.

As originally understood, the Eighth Amendment forbid as cruel only those methods that intensified the death sentence by "superadd[ing] terror, pain, or disgrace," to the punishment.  *Id.* at 1124.  Thus, the *Baze/Glossip* test's first prong incorporates the "available-alternative" prong to conduct a comparative analysis to answer whether a method of execution "cruelly superadds pain to the death sentence."  *Id.* at 1126 (citing *Glossip*, 135 S. Ct. at 2732–38, and Baze, 553 U.S. at 52).  "Distinguishing between constitutionally permissible and impermissible degrees of pain . . . is a *necessarily* comparative exercise"; it "isn't something that can be accomplished by examining the State's proposed method in a vacuum, but only by 'compar[ing]' that method with a viable alternative."  *Id.* (alteration in original) (quoting *Glossip*, 135 S. Ct. at 2737–38).

The Eighth Circuit's analysis in *Zink v. Lombardi* also examines the interplay between the *Baze/Glossip* test's two prongs and provides insight into whether a State's method of execution is cruel and unusual.  *See* 783 F.3d 1089, 1097 (8th Cir. 2015) (en banc).  There, the Eighth Circuit construed *Baze* as standing for the proposition that a state's refusal "to adopt a readily available alternative method of execution that would significantly reduce a substantial risk of severe pain . . . can be viewed as 'cruel and unusual' under the Eighth Amendment."  *Id.* (citation and internal

---

condition, the protocol as applied to him would be cruel and unusual punishment. *Bucklew*, 139 S. Ct. at 1119.  Mr. Bucklew argued that the *Baze*/*Glossip* test "should govern only facial challenges, not as-applied challenges like his." *Id.* at 1122.  Thus, Mr. Bucklew sought a test that divorced the "available-alternative" prong. *Id.*  The Eighth Circuit rejected the argument, holding that neither precedent nor history countenances a deviation from the substantive test. *See id.* at 1126–29.

quotation marks omitted).   The *Zink* court, however, admonished against resting an Eighth Amendment method of execution claim under the *Baze*/*Glossip* test's first prong based "entirely on hypothetical and speculative harms that, if they were to occur, would only result from isolated mishaps."  *Id.* at 1102.

Here, all parties agree that the generally accepted use of Midazolam in a clinical setting has evolved over time.  Currently, the generally accepted use of Midazolam is as a preoperative sedative agent in the pre-operative holding area.  Although Dr. Van Norman testified that neither she nor any reputable anesthesiologist to her knowledge would use Midazolam as the solo drug to produce general anesthesia for a surgical procedure today, when she trained in cardiac anesthesia beginning in the late 1980s and early 1990s, she trained by using a combination anesthetic that included a high-dose benzodiazepine in combination with a high-dose narcotic, plus a muscle paralytic agent.  At some point in her practice, Midazolam was the high-dose benzodiazepine used.  At some point later in her practice, the use of Midazolam in this manner was discontinued.  Dr. Van Norman maintains that, in this protocol under which she trained, a high-dose narcotic was used because Midazolam has no clinically significant analgesic properties, and the narcotic was administered for pain relief.

The Arkansas Midazolam Protocol calls for the administration of a much higher dose of Midazolam than the FDA-approved dose.  Even if there is general medical consensus that Midazolam has a ceiling effect, there is no such consensus on the dose of Midazolam at which a ceiling effect is exhibited.

By examining the Arkansas Midazolam Protocol, Dr. Van Norman is unable to say at what point any individual would experience extreme suffering and, instead, claims that that will vary

from person to person.  Further, Dr. Van Norman conceded that she has no direct scientific data to support the proposition that any inmate experienced severe pain and suffering during an execution.

With respect to the testimony offered by eyewitnesses to the April 2017 Arkansas executions, the Court observes, as an initial matter, that eyewitnesses to the same executions are not all in agreement as to what they observed.  Additionally, according to the FDA-approved package insert, Midazolam's reported side effects include involuntary movements and muscle tremors.  Coughing is generally a reflex response; it does not have to be a conscious response. Plaintiffs and defendants' expert witnesses agree that Midazolam can in some cases, but not all, cause an individual to stop breathing due to either the central mechanism, meaning that the drive to breathe just stops, or from upper airway obstruction, resulting from the tongue falling back, the airway muscles collapsing in a way, and the individual being unable to maintain his airway.  These events can lead to feelings of air hunger and suffocation and can often arouse an individual out of sedation to breathe a little harder or to make harder respiratory efforts to get air in.  However, it is generally understood that upper airway obstruction is not an indicator or denier of consciousness. In other words, nothing about the reported movements or sounds during the most recent executions as described by the eyewitnesses, even if the Court credits all testimony as favoring plaintiffs, pushes plaintiffs closer to meeting their burden to prove that Arkansas's current Arkansas Midazolam Protocol entails a substantial risk of severe pain.

In sum, based on the record before it, the Court determines that plaintiffs have failed to meet the first prong of the *Baze/Glossip* test.  The Court cannot conclude that plaintiffs have proven that the Arkansas Midazolam Protocol entails a substantial risk of severe pain as a result of the use of a 500-mg dose of Midazolam as the first drug in the three-drug protocol.  *See In re Ohio Execution Protocol Litig. (Hennes)*, 946 F.3d 287, 290 (6th Cir. 2019) (reasoning that the use of a

500-mg dose of Midazolam in Ohio's three-drug execution protocol did not violate the Eighth Amendment, even though it could cause pulmonary edema, because there was no evidence in the record that "a person deeply sedated by a 500 milligram dose of Midazolam is still 'sure or very likely' to experience an unconstitutionally high level of pain").  Plaintiffs' proof falls short.

## 2.   *Baze/Glossip* **Second Prong**

Because plaintiffs fail to meet their burden with respect to the first prong of *Baze/Glossip*, plaintiffs cannot prevail on their Eighth Amendment claim.  Even if plaintiffs could meet this burden, they would still fail on the evidence before the Court to satisfy the *Baze/Glossip* test's second prong.  Under this second prong, "an inmate cannot successfully challenge a method of execution under the Eighth Amendment unless he identifies an alternative that is feasible, readily implemented, and in fact significantly reduces a substantial risk of severe pain."  *Bucklew*, 139 S. Ct. at 1121 (citation and internal quotations omitted).

The burden that the *Baze/Glossip* test places on an inmate "can be overstated," as "[a]n inmate seeking to identify an alternative method of execution is not limited to choosing among those presently authorized by a particular State's law."  *Id.* at 1128.  This is so because a state's choice of execution protocol cannot cabin the comparative analysis the Eighth Amendment dictates.  *See id.*  Ultimately, an inmate's success on this prong depends on a court finding, first, that a proposed alternative is "feasible and readily implemented"; second, that the state lacks a "legitimate reason" for declining to adopt it; and, third, that the alternative method of execution "would significantly reduce a substantial risk of severe pain."  *Id.* at 1129.

For a state death-row inmate's proposed alternative method of execution to be "readily implemented," theoretical feasibility is not enough; rather, "the inmate's proposal must be sufficiently detailed to permit a finding that the State could carry it out 'relatively easily and

reasonably quickly.'"  *Id.* (quoting *McGehee*, 854 F.3d at 493).  For example, in *Bucklew*, the

Court found that a state death-row inmate's "bare-bones" proposal to use death by nitrogen gas,

depriving the body of oxygen, instead of Missouri's single-drug protocol for lethal injection using

the sedative pentobarbital, fell "well short" of this standard, reasoning that the inmate:

> presented no evidence on essential questions like how nitrogen gas should be
> administered (using a gas chamber, a tent, a hood, a mask, or some other delivery
> device); in what concentration (pure nitrogen or some mixture of gases); how
> quickly and for how long it should be introduced; or how the State might ensure
> the safety of the execution team, including protecting them against the risk of gas
> leaks.

*Id.* at 1129.

In addition, "the State must have access to the alternative and be able to carry out the

alternative method relatively easily and reasonably quickly."  *McGehee*, 853 F.3d at 493 (*Arthur*

*v. Comm'r, Ala. Dep't of Corr.*, 840 F.3d at 1268, 1300 (11th Cir. 2016)).  While this is a high

burden, "it is necessary to conform to the Eighth Amendment."  *Id.*  For example, *McGehee*

discussed the known "difficulty of obtaining drugs for use in lethal injection," and specifically

noted that Arkansas made at least three unsuccessful inquiries about obtaining barbiturates in 2015.

*Id.*  In *Arthur*, which the Eighth Circuit favorably cited in *McGehee*, the Eleventh Circuit:

> expressly [held] that the fact that other states in the past have procured a
> compounded drug and pharmacies in Alabama have the skills to compound the drug
> does not make it available to the [Alabama Department of Corrections] for use in
> lethal injections in executions.  The evidentiary burden on Arthur is to show that
> 'there is *now* a source for pentobarbital *that would sell it to the ADOC for use in
> executions*.'

840 F.3d at 1302 (quoting *Brooks v. Warden*, 810 F.3d 812, 820 (11th Cir. 2016)).

"There are . . . many legitimate reasons why a State might choose, consistent with the

Eighth Amendment, not to adopt a prisoner's preferred method of execution."  *Bucklew*, 139 S.

Ct. 1125 (citing *Glossip*, 135 S. Ct. at 2737–38, and *Baze*, 553 U.S. at 57, 66).  And, while "[t]he

Eighth Amendment prohibit states from dredging up archaic cruel punishments or perhaps inventing new ones, . . . it does not compel a state to adopt 'untried and untested' (and thus unusual in the constitutional sense) methods of execution." *Id.* at 1130 (quoting *Baze*, 553 U.S. at 41). In *Bucklew*, for example, the Court determined that Missouri "had a 'legitimate' reason for declining to switch from its current method of execution as a matter of law," reasoning that nitrogen hypoxia was "an entirely new method—one that had 'never been used to carry out an execution' and had 'no track record of successful use.'" *Id.* (first quoting *Baze*, 553 U.S. at 52; then quoting *McGehee*, 854 F.3d at 493).

At trial, plaintiffs presented proof regarding several potential alternative methods of execution.[8] Each potential alternative method fails for a different reason.

### a.  Firing Squad

Plaintiffs presented evidence regarding the use of a firing squad as a potential alternative method of execution.  Plaintiffs fail to prove that execution by a firing squad in fact significantly reduces a substantial risk of severe pain as compared to the current Arkansas Midazolam Protocol.

Plaintiffs attempted to meet this burden through Dr. Williams' trial testimony.  Even crediting all of Dr. Williams' testimony, he has never treated a gunshot victim within 60 seconds

---

[8]  Plaintiffs identified several potential alternative methods of execution in their amended complaint, including:  (1) firing squad, (2) injection of FDA-approved, manufactured pentobarbital, (3) injection of compounded pentobarbital, (4) massive overdose of sevoflurane as the sole lethal agent, (5) a three-drug protocol that substitutes etomidate for Midazolam, (6) a two-drug protocol consisting of a 100-milligran dose of diazepam followed by a 7,500-microgram dose of fentanyl, and (7) oral administration of a 10-gram dosage of secobarbital (Dkt. No. 117, ¶¶ 35–41).  However, plaintiffs' post-trial briefing focused only on execution by firing squad, oral administration of secobarbital, a barbiturate, and a single-drug protocol using pentobarbital (Dkt. No. 198, at 41–48).  As a result, the Court focuses on those three methods in its analysis.  To the extent that plaintiffs persist in asserting the alternative methods of execution not addressed in their proof, the Court determines that plaintiffs fail to meet their burden with respect to those alternative methods on the record before it.

of receiving an injury to the chest, nor within 10 to 15 seconds of receiving an injury to the chest;

has never treated a gunshot victim who has received five gunshot wounds to the chest with a .30

caliber rifle, which would be comparable to a firing squad, although he has treated a victim shot

twice in the chest with a .30 caliber rifle; and acknowledges that there is nothing in the medical

literature that addresses this situation.  Dr. Williams could not testify that an execution by firing

squad would be pain free.  In fact, Dr. Williams testified that, if shot in a bone or joint causing a

fracture, the gunshot wound would be painful, but he testified based on personal and medical

experience that fractures in ribs are less painful than fractures in other bones or joints.  Overall,

this proof falls short of meeting plaintiffs' burden under the second prong of *Baze/Glossip*.

### b.    Secobarbital

Plaintiffs presented evidence regarding the use secobarbital as a potential alternative

method of execution.  Plaintiffs fail to prove that execution by secobarbital is an alternative that is

feasible and readily implemented by the State.

Here, the Court heard testimony from Dr. Blanke.  Secobarbital has never been used in an

execution, and there are no studies or medical evidence of the effect of the drug on a condemned

individual who is unwilling to die.  The record evidence demonstrates that this method could take

days to be effective, and it currently falls short of demonstrating that Arkansas can obtain

secobarbital for use in executions from a willing vendor.  Overall, this proof falls short of meeting

plaintiffs' burden under the second prong of *Baze/Glossip*.  *See In re Ohio (Hennes)*, 946 F.3d at

291 (determining that death by secobarbital was not a feasible alternative to Ohio's three-drug

method-of-execution protocol because secobarbital has never been used in an execution, could

take over two days to cause death or might not cause death at all, and the prisoners failed to show

that Ohio could obtain secobarbital with "ordinary transactional effort" (quoting *In re Ohio Execution Protocol*, 860 F.3d 881, 891 (6th Cir. 2017))).

### c.    Pentobarbital

Plaintiffs maintain that "[t]here's no dispute that a single-drug pentobarbital protocol is preferable to a three-drug [M]idazolam protocol." (Dkt. No. 198, at 47).  They assert that, within the last four years, other states have conducted numerous pentobarbital executions (*Id.*).  Further, they contend that, with the new secrecy law to take effect in Arkansas, assuring that the supplier of execution drugs will not be identified, defendants should have access to this alternative (*Id.*, at 47–48).  Plaintiffs cast additional doubt on any claim that Director Kelley will be unable to obtain execution drugs, citing that such a claim was made in 2017 prior to defendants acquiring a supply of drugs to use in the April 2017 executions (*Id.*, at 48).

Plaintiffs' own witness, Dr. Blanke, testified that pentobarbital, which was used in the past as a drug for aiding patients in dying, is no longer available generally even for that purpose.  As a result, on this record, the Court is unwilling to conclude that plaintiffs have met their burden under the second prong of *Baze/Glossip* as to pentobarbital for use in executions, at least at this time.  *See McGehee*, 854 F.3d at 495 (explaining that "the State must have access to the alternative and be able to carry out the alternative method relatively easily and reasonably quickly" (citing *Arthur*, 840 F.3d at 1300)).

### B.    Claim 2:  The Fourteenth Amendment Equal Protection Clause And Consciousness Checks

Plaintiffs argue that the ADC deviated from its written Arkansas Midazolam Protocol that requires consciousness checks between the Midazolam administration and the other lethal drugs.  Plaintiffs assert that they "have a fundamental right under the Eighth Amendment to be free from cruel and unusual punishment" and that the consciousness checks called for by the Arkansas

Midazolam Protocol are "intended to guard against injection of painful drugs while the prisoner is capable of feeling them . . .[and] is a core protection of the Plaintiffs' fundamental right to be free from cruel and unusual punishment." (Dkt. No. 117, ¶¶ 43–44).  Plaintiffs contend that, based on the April 2017 executions, defendants failed to "apply the consciousness check consistently from execution to execution" and "either did not carry out an appropriate consciousness check or proceeded with the execution even after the condemned exhibited movements indicating consciousness."  (*Id.*, ¶ 45).  For these reasons, plaintiffs claim that defendants' failure to administer properly consciousness checks, which are "purported to protect the prisoners' fundamental right to be free from cruel and unusual punishment," denies plaintiffs equal protection under the law (Dkt. No. 198, at 50).

As a preliminary matter, it is not clear whether the Supreme Court or the Eighth Circuit recognize a distinct equal protection claim separate and apart from an Eighth Amendment claim in a method-of-execution case.  Generally, "a violation of state procedural law does not itself give rise to a due process claim,"  *Lee v. Hutchinson*, 854 F.3d 978, 981 (8th Cir. 2017) (per curiam) (quoting *Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 794 F.3d 1327, 1333 (11th Cir. 2015), and other courts have determined that the same holds true for an equal-protection claim, *see In re Ohio Execution Protocol Litig.*, No. 2:11-CV-1016, 2018 WL 1033486, at *17 (S.D. Ohio Feb. 22, 2018) (stating that "the Equal Protection Clause no more constitutionalizes state procedural law than the Due Process Clause"), *adhered to on reconsideration*, 2018 WL 2118817 (S.D. Ohio May 8, 2018), *report and recommendation adopted*, 2018 WL 6529145 (S.D. Ohio Dec. 12, 2018).

In *Zink*, however, the Eighth Circuit considered and rejected death-row inmates' claim that Missouri state officials violated the Equal Protection Clause by executing prisoners while legal activity seeking to stay their executions was pending because the practice violated the state's

written execution protocol.  *See* <u>783 F.3d at 1109</u>–11.  The prisoners "invoke[d] the 'fundamental right' strand of equal protection analysis" and argued that it was "unconstitutional for the State to disregard a 'core provision' of its execution protocol, and that a prohibition on executions before legal activity has ceased is a 'core provision.'"  *Id.* at 1110.  The Eighth Circuit held that, even assuming that the state officials deviated from the execution protocol in the manner alleged by the prisoners, "the practice d[id] not violate the Constitution" because "[t]here is no 'fundamental right' to avoid execution while no judicial stay is in effect but legal activity is pending."  *Id.* at 1110, 1111 (citing *Hamilton v. Texas*, <u>497 U.S. 1016</u> (1990)).

In addition, in the context of a challenge to the constitutionality of Ohio's execution protocol, the Southern District of Ohio rejected the state's attempt "to transform [the inmate's] Fourteenth Amendment claim into a pure Eighth Amendment claim," reasoning that the equal-protection claim:

> sufficiently targets that sweeping core deviations would at least burden Plaintiff's fundamental right by negating some of the precise procedural safeguards that this Court and the Sixth Circuit heralded in prior discussions of Eighth Amendment claims in this same litigation.  For present purposes, it does not matter whether there is a qualifying risk of severe pain--a conclusion rejected by the only medical expert who testified--but only the creation of unequal treatment impacting the fundamental protection involved.

*In re Ohio Protocol Litig. (Lorraine)*, <u>840 F. Supp. 2d 1044, 1054</u> (S.D. Ohio 2012) (quoting *Cooey v. Kasich*, <u>801 F. Supp. 2d 623, 653</u> (S.D. Ohio 2011), *denying motion to vacate stay*, <u>681 F.3d 601</u> (6th Cir. 2012); *see also In re Ohio*, <u>2018 WL 1033486</u>, at *17 (stating that, "to plead an Equal Protection claim that is distinct from a straight Eighth Amendment claim," a prisoner "must plead a deviation from or violation of a state law or regulation that increases the risk of an Eighth Amendment violation where the state law itself was created to protect Eighth Amendment

interests," such as an execution protocol (citing *In re Ohio Execution Protocol Litig. (Wiles)*, 868 F. Supp. 2d 625 (S.D. Ohio April 4, 2012))).

In a similar vein, the Eleventh Circuit has recognized the plausibility of an equal-protection claim premised on allegations that "Alabama failed to perform a required consciousness check in a recent execution, a significant deviation from its execution protocol," and "the veil of secrecy that surrounds Alabama's execution protocol." *Arthur v. Thomas*, 674 F.3d 1257, 1263 (11th Cir. 2012).

Finally, the Ninth Circuit Court of Appeals rejected a death-row inmate's claim that the Arizona Department of Corrections' execution protocol violated his right to equal protection because the protocol gave the Arizona Department of Corrections Director discretion to make decisions regarding the manner in which his execution would be carried out. *See Towery v. Brewer*, 672 F.3d 650, 659, 661 (9th Cir. 2012). In the process, the Ninth Circuit rejected the district court's "broad proposition" that, "[w]here there is no Eighth Amendment violation, . . . that necessarily means that there has been no interference with fundamental rights sufficient to trigger strict scrutiny under the Equal Protection Clause." *Id.* at 659 (citing *Mass Bd. Of Ret. v. Murgia*, 427 U.S. 307, 312 (1976)). The Ninth Circuit explained that it "d[id] not need to adopt this broad proposition to conclude that . . . there ha[d] been no showing . . . of any burden on the right to be free from cruel and unusual punishment." *Id.*

For purposes of this analysis, the Court will assume, without deciding, that the Eighth Circuit recognizes a separate equal-protection claim in the context of a method-of-execution challenge. Under the Equal Protection Clause of the Fourteenth Amendment, a state cannot "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1, "which is essentially a direction that all persons similarly situated should be treated alike," *Zink*,

783 F.3d at 1110 (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).

"A fundamental principle of equal protection is that the Constitution only prohibits intentional or purposeful discrimination by the state."   *Klinger v. Dep't of Corrs.*, 31 F.3d 727, 733 (8th Cir. 1994) (citing *Pers. Adm'r of Ma. V. Feeney*, 442 U.S. 256, 274 (1979)).

Because "dissimilar treatment of dissimilarly situated persons does not violate equal protection," the first step in an equal-protection analysis requires a determination of "whether the plaintiff[s] ha[ve] demonstrated that [they were] treated differently than others who were similarly situated to [them]." *Klinger*, 31 F.3d 727, 731 (8th Cir. 1994).  Plaintiffs must first make a threshold showing that they were treated differently than others who were similarly situated to them. *See id.* at 731 (citing *Barket, Levy & Fine, Inc. v. St. Louis Thermal Energy Corp.*, 21 F.3d 237, 242 (8th Cir. 1994)).  This "inquiry focuses on whether the plaintiffs are similarly situated to another group for the purposes of the challenged government action." *Id.* (*citing More v. Farrier*, 984 F.2d 269, 271 (8th Cir. 1993)).  To answer this question, the Court "must first precisely define the plaintiffs' claim." *Id.*

A legislative classification or distinction that "neither burdens a fundamental right nor targets a suspect class," will be upheld "so long as it bears a rational relation to some legitimate end." *Zink*, 783 F.3d at 1110 (quoting *Vacco v. Quill*, 521 U.S. 793, 799 (1997)).  When a state's action invades a fundamental right, however, then it will be "subjected to strict scrutiny and will be sustained only if [it is] suitably tailored to serve a compelling state interest." *Cleburne*, 473 U.S. at 440 (citing *Graham v. Richardson*, 403 U.S. 365 (1971), and *McLaughlin v. Florida*, 379 U.S. 184, 192 (1964)).  The Eighth Amendment is a fundamental right because it is explicitly guaranteed by the Constitution. *See Zink*, 783 F.3d at 1111 ("Fundamental rights consist of only

those rights that are 'explicitly or implicitly guaranteed by the Constitution'" (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez*, <u>411 U.S. 1, 32</u>–34 (1973))).

To analyze plaintiffs' claim, the Court will assume, without deciding, that all plaintiffs, with the exception of Mr. McGehee, are similarly situated to one another as condemned individuals subject to the Arkansas Midazolam Protocol. *See In re Ohio*, <u>2018 WL 1033486</u>, at *11 (rejecting Ohio's contention that plaintiffs, all of whom were subject to a sentence of death imposed by an Ohio court and were subjected to being executed under Ohio's execution protocol, were not similarly situated because of their idiosyncratic physical and mental characteristics that differed from other capital inmates). The Court's examination then focuses on whether the ADC failed to conduct consistent consciousness checks and whether, if it did so, that inconsistency burdens plaintiffs' Eighth Amendment rights.

In post-trial briefing, plaintiffs rely on proof from eyewitnesses to the April 2017 executions to support this claim (<u>Dkt. No. 198, at 50</u>–52). For example, Mr. Kissel purportedly saw by reading lips the Designee say, "I don't know," during Mr. Marcell Williams' execution. (*Id.* at 32). Further, Ms. Belter reported hearing an audible groan from Mr. Kenneth Williams, which plaintiffs describe as in response to the consciousness checks. Plaintiffs assert that Ms. Belter's testimony is supported by Mr. Kissel's, noting that Mr. Kissel also reported hearing a groan around the time of the consciousness check, though he couldn't place its exact timing.

To the extent that an equal-protection claim exists in this context, plaintiffs fail to meet their burden to succeed on such a claim. There is evidence of the type of consciousness checks that were performed. Specifically, there is evidence that each consciousness check was performed in the same way during the four executions in 2017, and there is evidence from some, but not all, eyewitnesses regarding all or a portion of the acts taken with respect to these checks. There is also

evidence that, in medical practice, this is the type of check a healthcare provider would perform when titrating Midazolam and observing anesthesia being administered.  The record evidence as a whole does not support plaintiffs' equal-protection claim.

According to the FDA-approved package insert, Midazolam's reported side effects include involuntary movements and muscle tremors.  Coughing is generally a reflex response; it does not have to be a conscious response.  Plaintiffs and defendants' expert witnesses agree that Midazolam can in some cases, but not all, cause an individual to stop breathing from either the central mechanism, meaning that the drive to breathe just stops, or airway obstruction, resulting from the tongue falling back, the airway muscles collapsing in a way, and the individual being unable to maintain his airway.  These events can lead to feelings of air hunger and suffocation and can often arouse an individual out of sedation to breathe a little harder or to make harder respiratory efforts to get air in.  However, it is generally understood that upper airway obstruction is not an indicator or denier of consciousness.  In other words, nothing about the reported movements or sounds during the most recent executions, as described by eyewitnesses, even if the Court credits all as favoring plaintiffs, leads this Court to conclude that plaintiffs have met their burden on this claim challenging the consciousness checks.

      **C.**      **Claims 3 And 4:  First Amendment Right Of Access To The Courts And Right To Counsel Under <u>18 U.S.C. § 3599</u> And The Execution Viewing Policy**

The Court addresses Claims 3 and 4 together because they involve common issues of law and fact.  These two claims relate to whether Director Kelley's policies deprive plaintiffs of their First Amendment right of access to the courts and their right to counsel under <u>18 U.S.C. § 3599</u>.  At the outset, given the unique circumstances presented by the execution context, the Court

determines that any putative right to access the courts necessarily depends on the right of counsel to petition the court on plaintiffs' behalf and, for this reason, also addresses the claims together.

Plaintiffs assert in Claims 3 and 4 that defendants' "prohibition on viewing and hearing the entirety of what goes on in the execution chamber" violates their First Amendment right of access to the courts and prevents plaintiffs' attorneys from protecting their clients' rights (Dkt. No. 198, at 52).  More specifically, plaintiffs maintain that Director Kelley's previous policy, in effect at the start of this litigation, prevented more than one attorney from witnessing the execution and prevented that attorney from contacting co-counsel or a judge during the execution (Dkt. No. 117, ¶¶ 52, 58).  Plaintiffs next contend that, by preventing plaintiffs' attorneys from seeing and hearing the full execution, defendants are violating plaintiffs' rights of access to the courts.  Plaintiffs assert that the prohibition on seeing any part of the execution until the condemned individual is strapped to the gurney and intravenous access is established fails to provide attorney access to the entire execution and violates plaintiffs' right of access to the courts (*Id.*, ¶¶ 50, 57).  Plaintiffs also assert that the prohibition on determining when each drug is injected under the Arkansas Midazolam Protocol prevents plaintiffs' attorneys from verifying that the executioners have not materially deviated from the Arkansas Midazolam Protocol and thereby violates plaintiffs' rights of access to the courts (*Id.*, ¶¶ 51, 57).

In response, defendants assert that plaintiffs' claims challenging the execution viewing policy are time barred, barred by *res judicata* and collateral estoppel, and too speculative because they are based on the contention "that something could go wrong during future executions and that *might possibly* cause a deprivation of their legal rights." (Dkt. No. 199, at 19).  Defendants also maintain that, in the light of the Joint Execution Viewing Policy agreed to by the parties in this

case, plaintiffs' execution viewing claims are moot (*Id.*, at 19).  Defendants also assert that these claims fail on the merits (*Id.*, at 19–21).

To examine the merits of these claims, the Court first determines whether the challenged restriction burdens plaintiffs' right of access to the courts and counsel.  If it does, the burden then shifts to defendants to demonstrate that the restrictions are reasonable.  *See Turner v. Safley*, 482 U.S. 78 (1987).

### 1.  Number Of Lawyers With Access To Court Viewing Execution[9]

Plaintiffs allege that certain of Director Kelley's proposed viewing policies deprive them of their right to petition courts to allege actual, non-frivolous constitutional deprivations occasioned by the method of their execution.  Plaintiffs allege that, in the execution context, there is a heightened possibility that counsel for plaintiffs may need to access the courts during the executions themselves.  Plaintiffs allege that Director Kelley's initial viewing policies would force plaintiffs' counsel either to view the execution or have telephonic access to the courts, but those

---

[9] As a threshold matter, defendants cite Arkansas Code Annotated § 16-90-502 at certain times as their basis for limiting execution witnesses to one attorney per inmate and to prohibit audio and video recordings of executions (Dkt. No. 27, at 79–80).  To the extent that this is in dispute, Arkansas Code Annotated § 16-90-502(e)(5)(C) expressly outlaws audio or video recordings of executions.  This Court previously determined that such a regulation does not run afoul of the First Amendment.  *See Ark. Times, Inc. v. Norris*, No. 5:07CV00195 SWW, 2008 WL 110853 *4 (E.D. Ark. Jan. 7, 2008) (observing that, while the Supreme Court has recognized that the First Amendment guarantees public access to criminal trials, an execution carried out by lethal injection "bears little resemblance to a criminal judicial proceeding, where public participation plays an indispensable functional role in the process itself, and where public access enables citizens to judge whether our system of criminal justice is fair").  Counsel for plaintiffs expressly disavow any "wish to record the executions"; rather, counsel for plaintiffs "wish only to be able to see and hear the entire execution, to have multiple counsel watch the execution, to have access to co-counsel and appropriate authorities in the event a problem arises." (Dkt. No. 31, at 28–29).  Therefore, the Court will assume that, for purposes of their claims alleging deprivations of the right to counsel and access to the courts, counsel for plaintiffs do not seek to record audio or video inside the prison facility.  Rather, the Court understands plaintiffs to seek more than one attorney to be permitted to witness each execution, and that each attorney be guaranteed adequate telephonic access to communicate with co-counsel and the courts.

initial policies would make accomplishing both impossible.   The Court recites the history of Director Kelley's initial viewing policies as related to the April 2017 executions in its factual findings in this Order.

These conditions, plaintiffs allege, cause an unconstitutional deprivation of their right of access to the courts.   Plaintiffs note that, given the potential exigencies inherent to the execution process, other states' departments of correction policies both permit multiple attorneys to witness executions and provide for methods by which counsel may contact the courts during the course of executions (Dkt. No. 2-2, Ex. 5).   With respect to the claim arising under § 3599, plaintiffs allege that a prospective motion for stay of execution, to be raised during the course of an execution in order to remedy an ongoing Eighth Amendment deprivation, amounts to an "appropriate motion and procedure" and "application for stay of execution" pursuant to the terms of § 3599(e) (Dkt. Nos. 2-2, ¶¶ 176–178; 117, ¶¶ 52, 54–58).   Therefore, according to plaintiffs, if only one attorney is permitted to witness the execution, without the capability of communicating with a court, it would be impossible to satisfy counsel's duties under § 3599 (Dkt. Nos. 2-2, ¶¶ 179–181; 117, ¶¶ 54–58).

Plaintiffs initially cited the case of Joseph Wood in Arizona as an example of the potential necessity of immediate judicial review during the execution process.   During Mr. Wood's nearly two-hour execution, his attorneys were forced to leave the witness room to seek a stay of execution during a telephonic hearing with a federal judge, which eventually was convened.   Mr. Wood died during the course of the 30-minute hearing.   (Dkt. No. 2-2, ¶¶ 15(c), 170).   Also, the Court notes that, in this case, counsel contacted the Court during Mr. Lee's execution and prior to Mr. Marcel Williams' execution, with the Court conducting hearings and issuing rulings on the respective motions made–one after the execution and one prior to it.   The Court further notes that, as to a

third execution, even Director Kelley testified that, had the events with Mr. Kenneth Williams gone on any longer, she would have thought that something needed to stop with the execution. However, before that thought could formulate, the events with Mr. Kenneth Williams were over, according to Director Kelley (Director Kelley).   The Court has this history in mind when examining the nature of the claimed right.

Plaintiffs allege that, in the past, Director Kelley's predecessors have permitted multiple attorneys to witness executions (Dkt. No. 2-2, ¶ 25).  Plaintiffs also allege that certain of Director Kelley's initially proposed policies in this case would permit only one attorney per inmate to witness an execution (Dkt. Nos. 2-2, ¶ 27, Ex. 9; 117, ¶ 22).  Plaintiffs also allege that, due to the terms of certain of Director Kelley's proposed policies, the lone witnessing attorney would have no access to a telephone during the execution (Dkt. Nos. 2-2, ¶ 28, Ex. 10; 117, ¶ 22).  Plaintiffs further allege that Director Kelley's predecessor provided procedures in the past that placed no restrictions on attorney viewing or phone access during the execution and that there is no indication as to when these policies changed (Dkt. No. 2-2, ¶ 29).

The Court entered a Preliminary Injunction Order finding that plaintiffs were likely to succeed on the merits of this specific claim regarding the number of lawyers with access to the court viewing the execution (Dkt. No. 54, at 92–100).   In that Order, the Court made factual findings specific to this issue and incorporates those findings here (*Id.*, ¶¶ 152–182).  In this Order, the Court also makes specific factual findings regarding this claim (*See supra*, ¶¶ 280–294).  While the appeal of the Preliminary Injunction Order to the Eighth Circuit was pending, the parties jointly proposed an execution viewing policy (Dkt. Nos. 62, 63).  Plaintiffs moved later to clarify the policy, which defendants opposed and the Court denied (Dkt. Nos. 73, 75–76).

The Joint Execution Viewing Policy was followed during the April 2017 executions.  At the bench trial in this matter following the executions, Director Kelley testified that she allowed two attorney witnesses to be present for each execution in April 2017, and the Deputy Director of the ADC held a cell phone that did not have a camera provided by the attorney witnesses and that was given to the attorney witnesses to use, if requested.  Director Kelley was not aware of any issues with that practice during the April 2017 executions.  Further, Director Kelley testified under oath that, while she serves as Director of the ADC, if another execution is scheduled, she does not plan to go back on the agreement that was reached in this case.

Director Kelley further testified that, while she is not opposed to the practice implemented by the parties' Joint Execution Viewing Policy being made a part of the ADC policy, she would prefer that the practice not be court-mandated due to concerns about a bill being considered by the Arkansas legislature that would jam cell phones in prison housing areas due to contraband and security issues.  Director Kelley is concerned that, if the bill becomes law, then cell phones in the area where executions are conducted might also be jammed and unusable.

Defendants take the position that, based on this, plaintiffs' claim regarding the number of attorney witnesses with access to the court viewing the execution is moot.  Plaintiffs request that the Court require the ADC to incorporate the Joint Execution Viewing Policy into formal ADC policy, not merely a practice subject to change as demonstrated by the facts of this case.  The Court credits Director Kelley's under oath testimony and credits that, while she serves as Director of the ADC, if another execution is scheduled, she does not plan to go back on the agreement that was reached in this case with respect to the Joint Execution Viewing Policy.  To the extent that a question of mootness is raised by these developments, Director Kelley's testimony does not convince this Court that the current plaintiffs' claim regarding the number of attorney witnesses

with access to the court viewing the execution is moot and that the merits need not be addressed by the Court.

"Federal courts are courts of limited jurisdiction and can only hear actual 'cases or controversies' as defined under Article III of the Constitution." *Hickman v. Missouri*, 144 F.3d 1141, 1142 (8th Cir. 1998) (quoting *Neighborhood Transp. Network, Inc. v. Pena*, 42 F.3d 1169, 1172 (8th Cir. 1994)). "[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Ringo v. Lombardi*, 677 F.3d 793, 796 (8th Cir. 2012) (alteration in original) (quoting *Preiser*, 422 U.S. at 401). However, it is well-established that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). The Supreme Court has explained that, if mere voluntary cessation of allegedly unconstitutional conduct could moot a case, "the courts would be compelled to leave the defendant free to return to his old ways"; therefore, a case becomes moot only "if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968) (alterations, citations, and internal quotation marks omitted); *see also Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 761 n.8 (8th Cir. 2008) (holding that defendants' voluntary change of potentially unconstitutional student apparel policy did not moot students' claim that defendants violated their rights under the First and Fourteenth Amendments by disciplining them for wearing black armbands to signify their disagreement with student apparel policy).

In its Preliminary Injunction Order, the Court determined that plaintiffs were likely to succeed on the merits of their access-to-the-courts and access-to-counsel claims, at least as they related to the number of attorneys for plaintiffs permitted to view each execution and those

attorneys' access to a telephone during each execution, and directed the parties to confer and jointly present to the Court an execution viewing policy that adequately protects these rights (Dkt. No. 54, at 92–101).  The Joint Execution Viewing Policy was filed in response to this directive (Dkt. No. 62).  Thus, because the Joint Execution Viewing Policy was proposed at the Court's direction *after* it had already found that the original execution viewing policy was substantially likely to be proven unlawful and awarded preliminary injunctive relief against defendants,  it is not clear that the *voluntary*-cessation doctrine is implicated here.  However, even if the voluntary-cessation doctrine does apply, the Court has only Director Kelley's statement that, so long as she remains Director of the ADC, she intends to abide by the Joint Execution Viewing Policy.  The Court takes judicial notice that Dexter Payne is now the Director of the ADC.  *See* Ark. Dep't of Corr., *Staff Directory*, https://adc.arkansas.gov/contact-us (last visited May 31, 2020).  Thus, while the Court has no reason to doubt the sincerity of Director's Kelley's statement, it does not make it "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 170 (2000) (citing *Concentrated Phosphate*, 393 U.S. at 203).[10]  Also of concern is that because defendants have taken corrective action only with respect to the named plaintiffs, holding the access-to-the-courts and access-to-counsel claims moot under these circumstances may allow defendants to insulate the contested policy from judicial review.  In short, defendants have not demonstrated mootness in this instance.

The Court also rejects any argument that the claim regarding the number of attorney witnesses with access to the court viewing the execution is time barred or barred by *res judicata*

---

[10]  At the same time, defendants' abandonment, at least for the time being, of the execution viewing policies in place at the time this action commenced is an important factor bearing on the question whether the Court should exercise its power to enjoin defendants from renewing the policies, "but that is a matter relating to the exercise rather than the existence of judicial power." *Aladdin's Castle*, 455 U.S. at 289.

or collateral estoppel, given the evidence that defendants intended to change the practice under

this policy for the April 2017 executions prior to plaintiffs initiating suit.  Instead, for the reasons

explained, the Court determines that plaintiffs prevail on their claim regarding the number of

attorney witnesses with access to the court viewing the execution.  The Court specifically relies on

Director Kelley's representation that, while she serves as Director of the ADC, if another execution

is scheduled, she does not plan to go back on the agreement that was reached in this case with

respect to the Joint Execution Viewing Policy when fashioning a remedy for this claim.

###### a.      The Contours Of This Right

Prisoners have a constitutional right to access the courts.  *See Bounds v. Smith*, 430 U.S.

817, 821 (1977).  "[T]he fundamental constitutional right of access to the courts requires prison

authorities to assist inmates in the preparation and filing of meaningful legal papers by providing

prisoners with adequate law libraries or adequate assistance from persons trained in the law."

*Lewis v. Casey*, 518 U.S. 343, 346 (1996) (quoting *Bounds*, 430 U.S. at 828).[11]  The Supreme

Court has required prison administrators to adopt "remedial measures to insure that inmate access

to the courts is adequate, effective, and meaningful."  *Bounds*, 430 U.S. at 822.

In *Lewis*, the Supreme Court explained that "[t]he right that *Bounds* acknowledged was the

(already well-established) right of *access to the courts*."  518 U.S. at 350.  The majority traced the

"roots" of this right, explaining that:  "[W]e had protected that right by prohibiting state prison

officials from actively interfering with inmates' attempts to prepare legal documents, or file them,

and by requiring state courts to waive filing fees, or transcript fees, for indigent inmates."  *Id*.

(citations and internal quotation marks omitted).  Having recited this jurisprudential arc, Justice

---

[11] The Supreme Court defined its main concern as "protecting the ability of an inmate to prepare
a petition or complaint."  *Bounds*, 430 U.S. at 828 n.17 (quoting *Wolff v. McDonnell*, 418 U.S 539,
576 (1974)).

Scalia, writing for the majority, summarized the right of access to the courts as follows:  prisoners must be afforded "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts."  *Id.* at 351 (quoting *Bounds*, 430 U.S., at 825).

Therefore, the question before this Court is whether the ADC's execution policies afford plaintiffs a reasonably adequate opportunity to present claimed constitutional violations during their executions.  Other district courts have addressed analogous challenges to similar execution policies, finding that "there is unquestionably a right to access the courts involved in the context of executions that inherently injects the issue of access to counsel into this discussion."  *Cooey v. Strickland*, No. 2:04-CV-1156, 2011 WL 320166, at *7 (S.D. Ohio Jan. 28, 2011) (footnote omitted).  "[C]ourts have recognized that the traditional access to the courts analysis requiring actual injury is unworkable in the prisoner execution context."  *Hoffman v. Jindal*, No. CIV.A. 12-796-JTB, 2014 WL 130981, at *6 (M.D. La. Jan. 10, 2014) (citing *Strickland*, 2011 WL 320166 at *11).  In this situation, the traditional actual injury analysis "makes no sense when many of the claims could not even be recognized until during the execution process."  *Strickland*, 2011 WL 320166, at *11.  Instead, in this "unusual context," the circumstances of an execution "present an inherent risk of actual injury to the timely and meaningful presentation of non-frivolous claims to a court."  *Id.* at *11.

This Court has considered, but declines to adopt, the contrary reasoning of the Eleventh Circuit in *Grayson v. Warden*, 672 F. App'x 956 (11th Cir. 2016).  In that case the Eleventh Circuit held that, to state a valid right-of-access claim, the death-row inmate had to establish an actual injury, and that his "request for access to a cell phone or landline [during his execution[ [was] based on the possibility that something could go wrong, which does not qualify as an actual injury."  *Id.* at 967 (citing *Lewis*, 518 U.S. at 351).  This Court concludes that *Grayson* misconstrued the

alleged constitutional deprivation at issue.  Unlike in *Grayson*, this Court does not find that plaintiffs have failed to allege an "actual injury" for standing purposes.  Here, plaintiffs do not allege that the imminent injury is the mere prospect of an Eighth Amendment violation occasioned during the executions.  Rather, plaintiffs allege that the imminent injury is the lack of meaningful access to a court from which they might seek redress from a prospective Eighth Amendment violation occasioned during the executions.

In a case cited, but not followed, in *Grayson*, the Middle District of Tennessee held that a death-row inmate had a right to have counsel view his execution with access to a telephone.  *See Coe v. Bell*, 89 F. Supp. 2d 962, 967 (M.D. Tenn. 2000), *vacated as moot*, 230 F.3d 1357 (6th Cir. 2000).  While the district court's decision was vacated as moot following the inmate's execution, its admonition regarding the right of access to the courts is worth repeating:

> Plaintiff has an Eighth Amendment right not to be subjected to cruel and unusual punishment, and substantial caselaw supports the contention that this right attaches until his successful execution.  Plaintiff's right to meaningful access to the courts to assert that right requires that counsel have some access to the prisoner during the last hour before the execution and be permitted to witness his execution and have access to a telephone until execution has been successfully carried out.

*Id.* at 966 (citations and internal quotation marks omitted).

Consequently, the district court held that "the plaintiff has the right under the First, Eighth, and Fourteenth Amendments to have some access to his counsel during the last hour before the execution and to have his counsel witness the execution," and that "his counsel must have access to a telephone with an unimpeded outside line at the time that he or she witnesses the execution." *Id.* at 967.

The Court has also considered the case of *Towery v. Brewer*, No. CV-12-245-DHX-NVW, 2012 WL 592749 (D. Ariz. Feb. 23, 2012), *aff'd on other grounds*, 672 F.3d 650 (9th Cir. 2012), but does not consider its reasoning applicable in this case.  *Towery* concerned the right to counsel

in the context of communications between prisoners and their counsel.  *See id.* at *18.  In that case, the prisoners alleged that the presence of prison authorities near their holding cell would hamper their ability for "privileged communication" with their counsel.  *Id.*  Here, plaintiffs' concern does not arise from alleged deficiencies in the communications between plaintiffs and their counsel; rather, plaintiffs' concern is that their counsel witnessing the executions will be unable to access the courts to seek redress.  Therefore, the Court finds the reasoning contained in *Strickland* and *Cole* to be more instructive here.

"It is for the courts to remedy past or imminent official interference with individual inmates' presentation of claims to the courts."  *Lewis*, 518 U.S. at 349.  "Meaningful access to the courts is the touchstone."  *Id.* at 351 (quoting *Bounds*, 430 U.S. at 823).  Plaintiffs have alleged that the ADC policies initially proposed in this case prohibited multiple counsel from witnessing the execution and failed to guarantee counsel's reasonable telephonic access to the courts.  Without both, plaintiffs allege that the ADC interferes with their right to petition this Court for relief, should it appear that the execution is being carried out in a way that violates the Eighth Amendment.

### b.     Whether Proposed Restrictions Are Reasonable

Although the Court determines that plaintiffs' right of access to the courts extends through the duration of their executions (Dkt. No. 53), plaintiffs' right of access to the courts is not absolute.  In the light of the substantial deference owed to the policies implemented by prison authorities, the issue before the Court is whether Director Kelley's viewing policies as announced prior to the parties proposing the Joint Execution Viewing Policy are reasonably related to legitimate penological interests.

 "[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform."  *Safley*, 482 U.S. at 84 (quoting *Procunier v. Martinez*, 416 U.S. 396,

405 (1974)).  Therefore, "courts owe 'substantial deference to the professional judgment of prison administrators.'"  *Beard v. Banks*, 548 U.S. 521, 528 (2006) (quoting *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003)).  "[R]estrictive prison regulations are permissible if they are 'reasonably related' to legitimate penological interests" and are not an "'exaggerated response' to such objectives."  *Id.* at 529 (quoting *Turner*, 482 U.S. at 87) (citations omitted).  "*Bounds* and *Turner* must be read *in pari materia*."  *Lewis*, 518 U.S. at 361.  "*Turner* applies to prison restrictions relating to rights *not* typically subject to strict scrutiny," including access to the courts.  *Roe v. Crawford*, 514 F.3d 789, 794 (8th Cir. 2008) (citing *Johnson v. California*, 543 U.S. 499, 510 (2005).  Therefore, the Court will examine the four factors of the *Turner* test to determine whether the prison regulations at issue impermissibly deprive plaintiffs of their constitutional right of access to the courts and statutory right to counsel.

Turner sets forth four factors that are relevant in determining the reasonableness of the regulation at issue:  "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate government interest put forward to justify it."  *Turner*, 482 U.S. at 89 (quoting *Block v. Rutherford*, 468 U.S. 576, 586 (1984).  Second, courts must consider "whether there are alternative means of exercising the right that remain open to prison inmates." *Id.* at 90.  "A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally."  *Id.* "Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Id.*

With respect to the first *Turner* factor, defendants assert two justifications for their viewing policies.  First, defendants claim that Arkansas Code Annotated § 16-90-502 mandates that only one attorney be permitted to witness each execution from the viewing room and also mandates that

attorneys may not bring devices capable of recording audio or video to the prison (Dkt. No. 29, at 92–93).  Second, defendants assert that their viewing policies are "validly and rationally connected to maintaining security in the prison setting."  (*Id.*, at 93).  The Court will address each justification in turn.

As to the first justification, the parties dispute whether the operative statute requires that only one attorney be permitted to witness an execution from the viewing room.  Arkansas Code Annotated § 16-90-502(e)(1)(E) provides, in relevant part, that among those present for an execution shall be "counsel for the person being executed if he or she chooses to be present."  Defendants contend that this provision confines the number of "counsel" to one attorney, while plaintiffs contend that "counsel" refers to one or more attorneys.  The Court notes that the plain language of the statute does not resolve this ambiguity.

However, during the preliminary injunction evidentiary hearing, Director Kelley testified that multiple attorneys for a condemned prisoner have been permitted to witness executions in the past (Tr. Hr'g Mot. Prelim. Inj., Vol. 4, at 1279 ("I don't know about under Mr. [Art L.] Lockhart, but I know under Mr. [Larry] Norris, only one attorney was present, and even, to my knowledge, and we can ask Jeff [Rosenzweig], when Jeff was there under Mr. Lockhart and there were two attorneys, one didn't leave")).  Also at the hearing, Director Kelley's immediate predecessor, Director Norris, testified that he could not recall whether multiple attorneys were permitted to witness executions during his tenure (Tr. Hr'g Mot. Prelim. Inj., Vol. 3, at 752).  In sum, this Court does not find that the statute requires that only one attorney be permitted to witness the execution in the viewing area.  Therefore, the Court is unwilling to find that Arkansas law mandates the prison regulation at issue.

For their second justification under the first prong of the *Turner* inquiry, defendants assert that their viewing policies are "validly and rationally connected to maintaining security in the prison setting." (Dkt. No. 29, at 93). The Eighth Circuit "accord[s] great deference to the judgment and expertise of prison officials, 'particularly with respect to decisions that implicate institutional security.'" *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 983 (8th Cir. 2004) (quoting *Goff v. Graves*, 362 F.3d 543, 549 (8th Cir. 2004). The Eighth Circuit has consistently held that the maintenance of prison security may satisfy the first *Turner* inquiry. *See*, *e.g.*, *Murchison v. Rogers*, 779 F.3d 882, 891 (8th Cir. 2015) (holding that state prison officials' censorship of one issue of state prisoner's weekly news magazine was rationally connected to officials' legitimate penological interest in prohibiting materials that promoted violence, disorder, or the violation of the law); *Rouse v. Benson*, 193 F.3d 936, 943 (8th Cir. 1999) (holding that restrictions on state prisoner's practice of his Native American religion did not violate his equal-protection rights because he failed to present "any evidence showing that other inmates following other religions have not been similarly limited"). In the light of the proper deference owed to prison administrators, the Court concludes that there is a valid, rational connection between the viewing policies and legitimate security interests. Consequently, the Court must turn to the remaining prongs of the *Turner* test to determine whether the viewing policies are reasonable, or instead constitute "an exaggerated response" to the defendants' security concerns. *Turner*, 482 U.S. at 91.

With respect to the second *Turner* factor, it is unclear that certain of Director Kelley's proposed viewing policies afford plaintiffs an alternative means to effectuate their rights to counsel and access to the courts. During her testimony at the evidentiary hearing, Director Kelley suggested that counsel for plaintiffs could be transported by car from the viewing room to the Deputy Warden's office, located in a separate building on the prison grounds, where counsel could

use an outbound phone line to convene a hearing with a court (Tr. Hr'g Mot. Prelim. Inj., Vol. 4, at 1270–71).

This alternative is inadequate for two reasons. First, this policy would not allow for the lone attorney permitted in the viewing room to continue witnessing the execution should that attorney need to petition a court during the execution. Access to a telephone would require the attorney viewing the execution to leave the viewing room. As a result, the inmate would be left without counsel present during a period of the execution. This would violate plaintiffs' statutory right to have counsel witness their executions. *See* Ark. Code Ann. § 16-90-502(e)(1)(E).

Second, access to an outbound telephone line that is located in a different building on the prison grounds substantially delays the ability for counsel to communicate with a court. According to Director Kelley's testimony, a witnessing attorney who sought to petition a court must first leave the witness room, enter a vehicle outside the execution building, be transported to a separate building on the prison grounds, and then travel to the Deputy Warden's office where an outbound telephone line would be provided. Minutes matter during an execution. Any delay diminishes the likelihood that a court could provide a meaningful remedy in the event of an ongoing constitutional deprivation. The Court determines that Director Kelley's policies, as they existed prior to the April 2017 executions and the proposal of the Joint Executive Viewing Policy, do not provide to plaintiffs a sufficient alternative means to exercise their right to access to the courts. In effect, Director Kelley's viewing policies render mutually exclusive the plaintiffs' right to have counsel witness the execution and plaintiffs' right to access the courts.

As to the third inquiry mandated by *Turner*, this Court must consider the impact that accommodation of the plaintiffs' right to access to the courts will have on guards, other inmates, and on the allocation of prison resources generally. *See* 482 U.S. at 90. If there is minimal impact

imposed by accommodation of the right, then this factor "weighs against the reasonableness of the policy." *Roe*, 514 F.3d at 798.

Defendants do not contend that permitting attorneys to bring a telephone, or providing an outbound line in the execution building, would impose substantial burdens on prison guards, other inmates, or the allocation of prison resources.  Rather, defendants assert that bringing two or more lawyers would "strain the ADC's limited space in the witness room." (Dkt. No. 29, at 94).  Further, defendants assert that permitting plaintiffs' counsel to have access to recording devices would violate Arkansas statute and harm defendants' legitimate interests in preserving the solemnity of executions and the dignity of the condemned prisoners and their families (*Id.*).  With respect to defendants' concerns regarding recording devices, the Court reaffirms that defendants may properly prohibit recording devices in the viewing room.  *See* Ark. Code Ann. § 16-90-502(e)(5)(C).  The Court turns to consider the impact of permitting more than one attorney on guards, other inmates, or the allocation of prison resources.

Arkansas law requires certain persons to be present at an execution:

(A) The director or an assistant designated by the director;

(B) The Department of Correction official in charge of medical services or his or her designee;

(C) No more than six (6) of the following persons related to a victim of a crime for which the person is being executed if he or she chooses to be present:
    (i)     A spouse;
    (ii)    Any parent or stepparent;
    (iii)   Any adult sibling or stepsibling; and
    (iv)   Any adult child or stepchild;

(D) A number of citizens determined by the director, not fewer than six (6) nor more than twelve (12), whose presence is necessary to verify that the execution was conducted in the manner required by law;

(E) Counsel for the person being executed if he or she chooses to be present; and

(F) The spiritual adviser to the person being executed if he or she chooses to be present.

Ark. Code Ann. § 16-90-502(e)(1).

The parties dispute whether "counsel" is singular or plural for purposes of this provision. Regardless, assuming, without deciding, that "counsel for the person being executed" refers to a single attorney, the Court determines that the maximum total of persons required by statute is 22. During her testimony at the evidentiary hearing, Director Kelley testified that there is room to seat at least 24 individuals in the viewing room (Tr. Hr'g Mot. Prelim. Inj. Vol. 4, at 1275). Director Kelley also testified that the viewing room could accommodate one additional person, or 25 people in total, by placing an additional seat in the room (*Id.*). Director Kelley testified that there will be a corrections officer present in the viewing room as well, though it is unclear to the Court whether the officer would occupy one of the 24 seats (*Id.*, at 1218). Therefore, there appears to be sufficient room for at least one additional person to be seated in the viewing room during an execution, even if all 12 citizen witnesses view the execution. The Court determines that requiring additional counsel to be present would not impose an undue burden on space constraints in the viewing room based on the current evidence before the Court.

Based on the evidence in the record, the Court does not find that accommodations of plaintiffs' rights to counsel and access to the courts would cause "a significant 'ripple effect' on fellow inmates or on prison staff." *Turner*, 482 U.S. at 90 (quoting *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 132–33 (1977)). Such accommodations would be made only in the limited circumstance of the duration of an execution. According to an exhibit attached to Director Kelley's affidavit, the State of Arkansas executed 27 inmates since 1990 prior to the April 2017 executions, amounting approximately to one execution per year (Dkt. No. 28-1, Ex. A). Because the accommodations sought by plaintiffs are confined solely to the execution context, the Court

determines that the accommodation of this right would have little impact on the allocation of prison resources generally, and few, if any, ripple effects on fellow inmates or on prison staff. For this reason, the Court determines that the third factor weighs against the reasonableness of certain of Director Kelley's proposed viewing policies. *See Roe*, 514 F.3d at 798.

Finally, regarding the fourth prong of the *Turner* test, "[i]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* (quoting *Turner*, 482 U.S. at 91). In their response to the motion to dismiss filed by defendants at the outset of this litigation, plaintiffs offered three accommodations that they asserted would provide adequate safeguards for plaintiffs' right to counsel and access to the courts (Dkt. No. 31, at 30–31). First, plaintiffs proposed that Director Kelley "permit two attorneys in the viewing area, so that if the need to communicate with the court or co-counsel in the warden's office manifests itself, one can communicate with a court and co-counsel while the other remains in the viewing area to continue to watch the execution." (*Id.*, at 30). Second, plaintiffs proposed that Director Kelley "permit a witnessing attorney to bring a cell phone into the prison, *with the device held by prison authorities*, but brought into the viewing area to be given to the attorney only if there is a need to contact a court or co-counsel; or, alternatively, permit witnessing attorneys access to ADC-provided phone lines during the execution." (*Id.*). Finally, plaintiffs proposed that Director Kelley "permit the witnessing attorney . . . to witness the execution from the time Plaintiffs enter the death chamber to pronunciation of death, and permit audio from the death chamber to the viewing area throughout the execution." (*Id.* at 30–31). All but the last of these proposals were agreed upon by the parties in their Joint Execution Viewing Policy and implemented without incident during the April 2017 executions.

The Court determines that the evidence in the record demonstrates readily available alternatives to Director Kelley's viewing policies that would accommodate plaintiffs' rights to counsel and access to the courts.  The viewing room has space to seat at least one additional member of plaintiffs' legal counsel, and there is evidence in the record that Director Kelley's predecessors have permitted multiple attorneys to witness executions.  Moreover, defendants have conceded their ability "to allow the Prisoners' attorneys to access a landline in the execution building."  (Dkt. No. 29, at 97).  During the April 2017 executions, witness attorneys were permitted to bring a cell phone with no recording device into the prison with the device held by prison authorities and with access to the cell phone by attorneys when necessary during the execution.  Consequently, the Court determines that, though considerable deference is due to the judgment of prison administrators regarding matters of prison security, the ready availability of alternatives weighs against the reasonableness of Director Kelley's viewing policies as proposed prior to the April 2017 executions.

### c.    Remedy

"It is the role of courts to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution."  *Lewis*, 518 U.S. at 349.  "It is for the courts to remedy past or imminent official interference with individual inmates' presentation of claims to the courts."  *Id.*

As *Lewis* makes clear, a district court must "scrupulously respect the limits on its role, by not thrusting itself into prison administration and instead permitting prison administrators to exercise wide discretion within the bounds of constitutional requirements."  *Id.* at 363 (alterations, citations, and internal quotation marks omitted).  Further, *Bounds*, recognized that "determining

the appropriate relief to be ordered presents a difficult problem." 430 U.S. at 818 (alterations, footnote, and internal quotation marks omitted).  Rather than crafting its own remedy, the district court in *Bounds* properly "charge[d] the Department of Correction with the task of devising a Constitutionally sound program to assure inmates access to the courts." *Id.* at 818–19 (internal quotation marks omitted).  The state responded with a proposal, which the district court ultimately approved with minor changes, after considering objections raised by the inmates.  *See id.* at 819–20.

For these reasons, the Court memorializes the Joint Execution Viewing Policy entered into by the parties prior to the April 2017 executions and followed during the April 2017 executions (Dkt. No. 62).  Per the parties' on-the-record representations, and consistent with *Bounds*, the Court directs the parties, absent good cause, to abide by the Joint Execution Viewing Policy.

### 2.     Viewing Initial Preparation And Viewing Or Knowing Of Drug Administration

Plaintiffs next contend that, by preventing their attorneys from seeing and hearing the full execution, defendants are violating their rights of access to the courts.  Plaintiffs assert that the prohibition on seeing any part of the execution until the condemned individual is strapped to the gurney and intravenous access is established fails to provide attorney access to the entire execution and violates their right of access to the courts (Dkt. No. 117, ¶¶ 50, 57).  Plaintiffs also assert that the prohibition on determining when each drug is injected under the Arkansas Midazolam Protocol prevents their attorneys from verifying that the executioners have not materially deviated from the Arkansas Midazolam Protocol and thereby violates plaintiffs' rights of access to the courts (*Id.,* ¶¶ 51, 57).  Defendants oppose these claims.  The Court views these claims differently than the claim regarding the number of lawyers with access to the court viewing the execution.

As an initial matter, there is no evidence before the Court that defendants altered from prior executions this policy or practice regarding whether counsel are permitted to view and hear the entirety of what goes on in the execution chamber, including the insertion of intravenous lines and information about when each drug in the Arkansas Midazolam Protocol is pushed.   More importantly, however, the Court is not convinced that rights under the First Amendment or 18 U.S.C. § 3599 have been extended to give rise to these particular types of claims.

To prevail on an "access-to-the-courts" claim, the plaintiffs must establish "an actual injury, that is, the hindrance of a nonfrivolous and arguably meritorious underlying legal claim." *White v. Kautzky*, 494 F.3d 677, 680 (8th Cir. 2007) (citing *Christopher v. Harbury*, 536 U.S. 403, 413, 415 (2002), and *Casey*, 518 U.S. at 351).   Without an actual injury, this Court does not have jurisdiction over the claim.   *See id.* (stating that the actual-injury requirement concerns standing to bring a claim); *Lewis*, 518 U.S. at 349 ("The requirement that an inmate alleging a violation of *Bounds* must show actual injury derives ultimately from the doctrine of standing." (citing *Allen v. Wright*, 468 U.S. 737, 750–52 (1984), and *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 471–76 (1982))).   *Lewis* specifically disclaims that the right to access embraces a right to "*discover* grievances, and to *litigate effectively* once in court." 518 U.S. at 353 (citing *Bounds*, 430 U.S. at 825–26).

The Ninth Circuit confronted a similar access claim in *First Amendment Coalition of Arizona, Inc. v. Ryan*, 938 F.3d 1069, 1080 (9th Cir. 2019).   In *Ryan*, prisoners sought an "injunction that would allow witnesses to hear the sounds of the entire execution proceeding, from the time that the prisoner is brought into the execution room to the time of death." *Id.* at 1073. The district court denied the injunction, and the Ninth Circuit affirmed.

The Ninth Circuit cited the two types of right to access claims generally recognized as available under the First Amendment:  "[(1)] the denial of adequate law libraries and other legal assistance to prisoners, which prevents them from challenging their sentences and the conditions of their confinement[, and (2)] claims involv[ing] active interference with a prisoner's right to litigate, such as seizing and withholding the prisoner's legal files."  *Id.* at 1080 (citations omitted). The Ninth Circuit highlighted the Supreme Court's admonishment from *Lewis* that "the First Amendment right of access to the courts does not include the right of prisoners to 'discover grievances[ ] and to litigate effectively once in court.'"  *Id.* (alteration in original) (quoting *Lewis*, 518 U.S. at 354).  The court noted that the prisoners' only purpose for the information they sought was to facilitate the discovery of colorable constitutional violations.  *See id.*  The court concluded that the inmates were not entitled to such information, and thus, the claim failed as a matter of law. *See id.*; *but see id.* at 1082 (Berzon, C.J., dissenting in part) (stating that the inmates plausibly alleged "that Arizona, through its deliberate concealment of information about its execution process, has violated their First Amendment right of access to the courts").

Absent evidence that defendants' policy or practice on these points changed from prior executions to the April 2017 executions, and given the uncertain state of the law with respect to this type of claimed right, the Court determines that defendants are entitled to judgment in their favor on plaintiffs' claims seeking to permit their attorneys to see and hear the full execution, including the insertion of intravenous lines and information about when each drug in the Arkansas Midazolam Protocol is pushed.

## V.      Conclusion

For these reasons, the Court determines that defendants are entitled to judgment in their favor on plaintiffs' claim one under the Eighth Amendment and on plaintiffs' claim two under the

Eighth Amendment and the Equal Protection Clause.  The Court determines that plaintiffs are entitled to judgment in their favor, in part, and that defendants are entitled to judgment in their favor, in part, on plaintiffs' claims three and four under the First Amendment and the right to counsel under 18 U.S.C. § 3599.  The Court orders relief consistent with the terms of this Order. Specifically, the Court memorializes the Joint Execution Viewing Policy entered into by the parties prior to the April 2017 executions and followed during the April 2017 executions (Dkt. No. 62), and, per the parties' on-the-record representations, the Court directs the parties, absent good cause, to abide by the Joint Execution Viewing Policy.

It is so ordered this 31st day of May, 2020.

Kristine G. Baker
United States District Judge

**Court's Exhibit A**
**Defendants' Request To Admit Exhibits**
**Page 1**

| Exhibit | Ruling From Preliminary Injunction | Record Cite* | Bench Trial Listed Exhibit | Court's Bench Trial Ruling |
|---|---|---|---|---|
| Defendants' Exhibit 5 | 4/11/17 Admitted | 229, 362 | Yes, Admitted 5/2/19 | Admit |
| Defendants' Exhibit 6 | 4/11/17 Admitted | 229, 325 | Yes, Admitted 4/23/19 | Admit |
| Defendants' Exhibit 12** | 4/11/17 Admitted | 339 | | Admit |
| Defendants' Exhibit 16 | 4/12/17 Admitted | 777 | Yes, Admitted 4/23/19 | Admit |
| Defendants' Exhibit 25 | Not Admitted | | | Not Admitted |
| Defendants' Exhibit 26** | 4/11/17 Admitted | 341-42 | Yes, Admitted 4/29/19 | Admit |
| Defendants' Exhibit 35 | 4/12/17 Admitted | 625 | | Admit |
| Defendants' Exhibit 36** | 4/12/17 Admitted | 625 | | Admit |
| Defendants' Exhibit 37 | 4/13/17 Admitted | 981 | | Admit |
| Defendants' Exhibit 38 | 4/13/17 Admitted | 981 | | Admit |
| Defendants' Exhibit 39 | 4/13/17 Admitted | 981 | | Admit |
| Defendants' Exhibit 40** | 4/13/17 Admitted | 981 | | Admit |
| Defendants' Exhibit 41 | 4/13/17 Admitted | 981 | | Admit |
| Defendants' Exhibit 42 | 4/13/17 Admitted | 981 | | Admit |
| Defendants' Exhibit 44 | 4/13/17 Admitted | 981 | | Admit |
| Defendants' Exhibit 45 | Not Admitted | | | Not Admitted |
| Defendants' Exhibit 46 | Not Admitted | | | Not Admitted |
| Defendants' Exhibit 47 | 4/13/17 Admitted | 981 | | Admit |
| Defendants' Exhibit 48 | 4/13/17 Admitted | 981 | | Admit |
| Defendants' Exhibit 49** | 4/13/17 Admitted | 981 | | Admit |
| Defendants' Exhibit 50** | 4/12/17 Admitted | 625 | | Admit |

**Court's Exhibit A**
**Defendants' Request To Admit Exhibits**
**Page 2**

| Exhibit | Ruling From Preliminary Injunction | Record Cite* | Bench Trial Listed Exhibit | Court's Bench Trial Ruling |
|---|---|---|---|---|
| Defendants' Exhibit 51** | 4/13/17 Admitted | 983-84 | | Admit |
| Defendants' Exhibit 52 | 4/13/17 Admitted | 983-84 | | Admit |
| Defendants' Exhibit 53 | Not Admitted | | | Not Admitted |
| Defendants' Exhibit 54 | Not Admitted | | | Not Admitted |
| Defendants' Exhibit 55 | 4/13/17 Admitted | 987-88 | | Admit |
| Defendants' Exhibit 56 | 4/13/17 Admitted | 987-88 | | Admit |
| Defendants' Exhibit 57 | Not Admitted | | | Not Admitted |
| Defendants' Exhibit 58 | 4/13/17 Admitted | 987-88 | | Admit |
| Defendants' Exhibit 59 | 4/13/17 Admitted | 987-88 | | Admit |
| Defendants' Exhibit 60 | 4/13/17 Admitted | 987-88 | | Admit |
| Defendants' Exhibit 61 | 4/13/17 Admitted | 987-88 | | Admit |
| Defendants' Exhibit 62** | 4/13/17 Admitted | 980, 987-88 | | Admit |
| Defendants' Exhibit 63 | Not Admitted | | | Not Admitted |
| Defendants' Exhibit 64 | 4/13/17 Admitted | 987-88 | | Admit |
| Defendants' Exhibit 65 | 4/13/17 Admitted | 987-88 | | Admit |
| Defendants' Exhibit 66 | Not Admitted | | | Not Admitted |
| Defendants' Exhibit 67 | 4/13/17 Admitted | 987-88 | | Admit |
| Defendants' Exhibit 68** | 4/13/17 Admitted | 987-88 | | Admit |
| Defendants' Exhibit 69 | Not Admitted | | | Not Admitted |
| Defendants' Exhibit 70** | 4/12/17 Admitted | 625 | | Admit |
| Defendants' Exhibit 71 | 4/13/17 Admitted | 987-88 | | Admit |
| Defendants' Exhibit 72 | 4/12/17 Admitted | 616-17 | Yes, Admitted 4/29/19 | Admit |
| Defendants' Exhibit 73** | 4/13/17 Admitted | 1013 | Yes, But Not Admitted | Admit |

*Record Cite references the point in the preliminary injunction record where the Exhibit was moved into admission.
**Plaintiffs withdrew their objections to these Exhibits post-trial (Dkt. No. 198, at 27–28 n.2).